**MCI TELECOMMUNICATIONS CORP., Plaintiff,**

v.

**DOMINICAN COMMUNICATION CORP., and Hello Card, Inc., Defendants.**

**No. 94 CIV. 1787(JES).**

United States District Court,
S.D. New York.

Nov. 10, 1997.

Shaw, Pittman, Potts & Trowbridge, New York, NY, for Plaintiff; Kenneth A. Caruso, Janet A. Broekel, of counsel.

Porzio, Bromberg & Newman, Morristown, NJ, for Plaintiff; Howard J. Schwartz, Cynthia D. Richardson, of counsel.

Andrew H. Perkins, Washington, DC, for Plaintiff.

Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for Defendants; Kenneth M. Van Deventer, Marianne Santangelo Conklin, of counsel.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Pursuant to 28 U.S.C. §§ 1331 and 1337, and the Communications Act of 1934, 47

U.S.C. § 151 *et seq.*, plaintiff MCI Telecommunications Corp. ("MCI") filed the instant action against defendants Dominican Communication Corp. ("Dominican") and Hello Card, Inc. ("Hello") to recover monies allegedly owed for telecommunication services rendered. Dominican counterclaimed for breach of contract, recision of the contract, willful misconduct, fraud, unjust enrichment, tortious interference with contract, misrepresentation, mutual mistake, and violations of Section 201(b) of the Communications Act of 1934 and New York Gen. Bus. Law. § 349. Pursuant to Federal Rule of Civil Procedure 12, MCI moves to dismiss Dominican's counterclaims. Under the doctrine of primary jurisdiction, Dominican cross-moves to refer MCI's complaint to the Federal Communications Commission ("FCC") for a declaration of the parties' rights and liabilities, and to stay all other court proceedings herein. For the reasons that follow, MCI's motion is denied, Dominican's unreasonable practices counterclaim is referred to the FCC, and Dominican's cross-motion to stay the remainder of the action is denied.

## BACKGROUND

MCI is a common carrier of interstate and international telecommunications services for individual and corporate users, with its principal place of business in Washington D.C. See First Amended Complaint ("Am. Compl.") ¶¶ 1, 6. Dominican is a New York State based long distance telephone services provider which serves predominantly Spanish-speaking communities in the United States by providing long distance telephone service to the Dominican Republic. See Am. Compl. ¶¶ 2, 7; Amended Answer and Counterclaims ("Am. Ans.") ¶ 20. Hello is a New York based telecommunications company affiliated with and controlled by Dominican which resells long distance telephone service through prepaid calling cards. See Am. Compl. ¶¶ 3, 8–9.

In or about April, 1993, Dominican began using U.S. Sprint ("Sprint") as the telephone carrier for its New York City operations. See Am. Ans. ¶ 25. Shortly thereafter, MCI approached Dominican with a proposal to have MCI replace Sprint as Dominican's tele-

communications provider. See Am. Ans. ¶¶ 25, 26; Am. Compl. ¶ 10. During this initial meeting, Edward Quintana, MCI Senior Account Executive, and Karen Bachmeier, MCI Account Executive Representative, told Dominican that, as a result of various discounts, MCI was offering Dominican an "effective rate" of $.47 per minute between New York City and the Dominican Republic. See Am. Ans. ¶ 27. This offer undercut the Sprint rate by $.02 per minute. Id. In early 1993, Dominican enrolled in the MCI Vision Value Insurance Plan Plus program pursuant to the terms and conditions set forth in MCI Tariff F.C.C. No. 1. (the "Tariff"). See Am. Compl. ¶ 10.

Pursuant to FCC requirements, telecommunications carriers must draft a tariff which, upon FCC approval, will govern their rate structure. MCI Tariff F.C.C. No. 1, section C, paragraph 10, includes a Competitive Response Promotion ("CRP") clause which provides:

> In order to acquire or retain customers, MCI will match certain offers made by other interexchange carriers where the customer can demonstrate to MCI's satisfaction that it intends to accept such offer as an inducement to subscribe to or remain subscribed to such other interexchange carrier's services.

Am. Ans. ¶ 44. Section B, paragraph 17 contains a similar competitive exception, entitled "Specialized Customer Arrangements" ("SCA"). SCA's are "individual negotiated contract[s] . . . tailored to meet the customer's needs." Id.

In or about late May, 1993, Dominican received its first bill from MCI and discovered that MCI was charging $.62 per minute for calls between New York City and the Dominican Republic. See Am. Ans. ¶ 30. Dominican contacted MCI in an effort to resolve this billing discrepancy. Id. ¶ 31. MCI informed Dominican that one of the discounts offered by Quintana was inapplicable under the Tariff, and consequently, it was unable to offer the $.47 per minute rate. Id.

On June 11, 1993, Dominican's President, Eleno Ramos, met with Quintana, Timothy Preston, an MCI Sales Manager, and Roger Zepka, an MCI Senior Branch Manager.

*See* Am. Ans. ¶ 33. At this meeting, MCI presented Dominican with a written agreement for execution, wherein MCI proposed that it would continue providing service to Dominican for the remainder of the contract term at the Tariff rate of $.62 per minute, but would then subsidize that rate with various free goods and discounts. *Id.* ¶¶ 34, 35. MCI allegedly threatened immediate termination of Dominican's service should Dominican fail to sign the new contract. *Id.* ¶ 35. Because establishing new service would have taken several months, Dominican claims that it had no viable alternative but to concede to MCI's terms and execute the agreement. *Id.* ¶¶ 32, 35. MCI also allegedly insisted on several oral modifications to the new contract, to which Dominican agreed in order to avoid having its service terminated. *Id.* ¶ 38. Thereafter, Dominican made several more payments to MCI. *Id.*

In or about August or September, 1993, San Juan/St. Thomas, a Caribbean telecommunications carrier, offered to provide Dominican with phone service from New York City to the Dominican Republic at a rate of $.37 per minute, and American Telephone and Telegraph Co. ("AT & T") offered to provide service at a rate of $.35 per minute. *See* Am. Ans. ¶¶ 39, 40. Dominican allegedly presented both offers to MCI, and asked that they match those offers, but MCI refused. *Id.* Thereafter, Dominican contracted for service with AT & T. *Id.* ¶¶ 39–41. In or about December, 1993, AT & T refused to continue providing service to Dominican at the $.35 per minute rate. *Id.* ¶ 42.

On March 14, 1994, MCI filed the instant action pursuant to 28 U.S.C. §§ 1331 and 1337 and the Communications Act of 1934, 47 U.S.C. § 151 et seq., seeking damages for breach of tariff and breach of contract, together with attorney's fees and costs.

On June 3, 1994, Dominican counterclaimed seeking damages for breach of the contract, willful misconduct,[1] fraud, tortious interference with its subsequent contract with AT & T, unjust enrichment, and violations of the Communications Act and New York General Business Law § 349, as well as recision of the contract based on misrepresentation and mutual mistake. Dominican subsequently voluntarily dismissed with prejudice its claim of tortious interference with the AT & T contract. See Order, dated December 8, 1994.

On August 5, 1994, MCI moved to dismiss Dominican's counterclaims pursuant to Federal Rule of Civil Procedure 12, arguing that (1) Dominican's claims are barred by the filed tariff doctrine; (2) Dominican's state-law claims are preempted by the Communications Act; and (3) Dominican's breach of tariff and willful misconduct claims fail to state a cause of action.

On September 13, 1994, Dominican cross-moved to refer issues involving the construction and application of the CRP clause to the FCC and to stay all other court proceedings herein pending the FCC's declaration of the parties' rights and liabilities. Dominican argues that (1) under the doctrine of primary jurisdiction the FCC must interpret the Tariff; (2) MCI's practice of selectively meeting competitive offers is an unreasonable practice requiring FCC scrutiny and sanctions; (3) and the CRP clause obligates MCI to match or better competitive offers.

At Oral Argument, Dominican represented that it no longer seeks enforcement of the $.47 per minute contract rate, but maintains its claim for recision of the contract, fraud, and/or enforcement of the Tariff rate under the CRP clause, which Dominican claims required MCI to match the rates offered by AT & T and San Juan/St. Thomas.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 12, pleadings are not subject to dismissal unless it appears to a certainty that a party cannot possibly be entitled to relief under any set of facts which could be proven in support of a claim. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2

---

1. Section B, paragraph 4.02 of the Tariff provides:

MCI's liability for wilful misconduct, if established as a result of judicial or administrative proceeding, is not limited by this tariff. Am. Ans. ¶ 51.

L.Ed.2d 80 (1957); *Harsco Corp. v. Segui,* 91 F.3d 337, 341 (2d Cir.1996).

■ Under the "filed tariff doctrine," a duly filed tariff exclusively defines the rates a carrier may charge for its services, and deviation from the tariff is not permitted. *See Maislin Industries, U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 117, 110 S.Ct. 2759, 2761, 111 L.Ed.2d 94 (1990); *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981); *Armour Packing Co. v. United States,* 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908). The rationale underlying the doctrine is that tariffs are public documents, and therefore a customer may be charged with knowledge of the filed tariff rate. *See Maislin,* 497 U.S. at 127, 110 S.Ct. at 2766; *Marco Supply Co. v. AT & T Communications,* 875 F.2d 434 (4th Cir.1989). Accordingly, once a tariff has been filed and the rates therein deemed reasonable by the governing agency, a defendant may not assert equitable defenses to collection of the tariff. See *Maislin,* 497 U.S. at 117, 126–27, 110 S.Ct. at 2761, 2765–66 (prohibiting equitable defenses to the collection of a filed tariff under the Interstate Commerce Act); *Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 97, 98, 35 S.Ct. 494, 495–96, 59 L.Ed. 853 (1915) (prohibiting deviation from filed tariff under Interstate Commerce Act).

Although the majority of cases addressing the filed tariff doctrine have done so in the context of the Interstate Commerce Act ("ICA"), courts have also applied the filed tariff doctrine in cases arising under the Communications Act. *See Marco Supply,* 875 F.2d at 436 (4th Cir.1989) (dismissing aggrieved customer's tortious misrepresentation claim); *AT & T v. New York City Human Resources Admin.,* 833 F.Supp. 962, 978–79 (S.D.N.Y.1993) (stating that rationale underlying decisions dealing with the ICA applies to tariffs under the Communications Act); *MCI Telecommunications Corp. v. TCI Mail, Inc.,* 772 F.Supp. 64, 67–68 (D.R.I.) (finding that doctrine does not preclude claim of willful misconduct where liability for claim is permitted in tariff); *see generally MCI Telecommunications Corp. v. American Telephone and Telegraph Co.,* 512 U.S. 218, 233–34, 114 S.Ct. 2223, 2233, 129 L.Ed.2d 182 (1994) (holding that FCC's ability to modify Communications Act's requirements does not permit FCC to make basic fundamental changes in regulatory scheme).

■ In the instant case, there are sufficient allegations in the record to establish that MCI declined to match Sprint's original rate and two subsequent offers that were below MCI's rate, which rates Dominican claims it was prepared to accept, and one of which it did accept. Therefore, the only question is whether the Tariff's CRP clause permits MCI to exercise discretion in declining to match offers. Dominican argues that it does not, and that MCI's failure to match competing offers constitutes an unreasonable practice [2] under the Communications Act. Moreover, Dominican argues that its unreasonable practice counterclaim must be referred [3] to the FCC since enforcement of the claim requires the resolution of issues which have been placed within that administrative body's special competence. *See generally United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

Under the doctrine of primary jurisdiction, the Second Circuit has enumerated the following factors to determine when to refer a claim to an agency: (1) whether the question at issue is within the conventional expertise of judges or whether there are technical or policy issues present which require agency

---

2. Section 201(b) of the Communications Act provides, in part:

All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That ...

47 U.S.C. § 201(b) (1991).

3. "Referral" is technically a misnomer since the Communications Act does not contain a mechanism whereby the Court can on its own authority demand or request a determination from the FCC. *See generally Reiter v. Cooper,* 507 U.S. 258, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (describing referral under the ICA). Instead, referral is triggered by the filing of an administrative complaint. *Id.*

expertise; (2) whether there exists a substantial danger of inconsistent rulings; and (3) whether the fair administration of justice weighs substantially against referral. *See Nat'l Communications Assoc., Inc. v. Am. Tel. & Tel. Co.,* 46 F.3d 220, 222–23 (2d Cir.1995) (analyzing above factors and finding no risk of inconsistent tariff interpretation where tariff did not need to be interpreted and only narrow factual dispute at issue). In addition, the Supreme Court has emphasized the desirability of establishing uniformity and the benefits of utilizing an agency's expert and specialized knowledge. *See Western Pacific Railroad Co.,* 352 U.S. at 64, 77 S.Ct. at 165.

In this case, unquestionably a resolution of the issues raised requires that a determination be made as to 1) whether a deviation from the filed rate, can, consistent with communications policy, be left to the discretion of the carrier; and 2) whether the Tariff permits the exercise of discretion once the conditions for a deviation are met. Thus, the resolution of the unreasonable practice counterclaim requires an interpretation of the CRP clause which the FCC is better suited to resolve. The FCC will also presumably have knowledge of the prevalence and use of such clauses in the industry. Moreover, interpretation of the CRP clause may implicate policy considerations better left to the FCC since allowing parties to selectively deviate from a filed rate could undermine the Communications Act's mandate of uniformity. *See MCI Telecommunications Corp.,* 512 U.S. at 220–21, 114 S.Ct. at 2226 (the Communications Act authorizes the FCC to regulate rates for communication services to ensure that such rates are reasonable and nondiscriminatory). Furthermore, referring construction and interpretation of the CRP clause to the FCC will mitigate the danger that other courts, when faced with this issue, may render inconsistent rulings. *See Nat'l Communications Assoc.,* 46 F.3d at 224, 225.

■ The majority of Dominican's remaining counterclaims appear to be barred by the filed tariff doctrine and/or preempted by the Communications Act. *See Maislin,* 497 U.S. at 127, 110 S.Ct. at 2766 (explaining filed rate doctrine); *Wegoland, Ltd. v. NYNEX Corp.,*

27 F.3d 17, 22 (2d Cir.1994) (no fraud exception to filed rate doctrine); *Nordlicht v. New York Telephone Co.,* 799 F.2d 859, 864 (2d Cir.1986), *cert. denied* 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987) (concluding that it is appropriate to fashion uniform body of federal common law to resolve plaintiff's claims); *Ivy Broadcasting Co. v. Am. Tel. & Tel. Co.,* 391 F.2d 486, 490 (2d Cir.1968) (federal common law preempts state law and supplies the rule of decision for tort and contract claims relating to duties, charges, and liabilities of telephone carriers concerning interstate telecommunications); *Fax Telecommunicaciones v. AT & T,* 952 F.Supp. 946, 955 (E.D.N.Y.1996) (stating that because of the requirements of the filed rate doctrine, claims of willful misconduct must be barred if they would require the Court to either enforce a discriminatory rate or to assess the reasonableness of a proposed rate); *but see AT & T v. New York City Human Resources Admin.,* 833 F.Supp. at 979, n. 9 (stating that filed tariff doctrine would not preclude defendant from avoiding charges by proving willful misconduct pursuant to the Tariff); *Gelb v. Am. Tel. & Tel. Co.,* 813 F.Supp. 1022, 1025 (S.D.N.Y.1993) (filed rate doctrine does not bar tort claim with an indirect nexus to rate setting function of agencies but may prohibit retroactive rate-setting as part of remedy); *Towne Reader Service, Inc. v. MCI Telecommunications Corp.,* 1992 WL 225550, at *2, 3 (W.D.N.Y.1992) (explaining that previous courts have failed to address savings clause contained in Communications Act, and finding tortious misrepresentation claim not barred by filed tariff doctrine); *MCI Telecommunications Corp. v. TCI Mail, Inc.,* 772 F.Supp. at 67–68 (stating that if defendant can demonstrate that Tariff permits recovery for willful misconduct, and can prove such conduct by plaintiff during the negotiations to provide services to defendant, liability is not precluded).

However, as noted above, it is not clear that all of Dominican's claims would be barred since the Tariff specifically provides that it does not limit liability for willful misconduct. Dominican alleges that MCI: 1) intentionally misrepresented the rate that MCI would charge for telecommunications services in order to induce Dominican to

switch service from Sprint to MCI; 2) used duress to coerce Dominican to accept a rate that was less favorable than the one originally offered by MCI and accepted by Dominican; 3) failed to train or otherwise supervise its sales agents who MCI knew, or should have known, were intentionally, recklessly, or negligently misrepresenting MCI's rates to induce customers to commence telecommunications services with MCI; and 4) otherwise breached contracts, warranties, representations and undertakings made orally in the MCI Tariff and otherwise. Some of these claims may be subject to a motion for summary judgment on the theory that there could be no reasonable reliance since a customer is presumed to have knowledge of the Tariff rate. Others, however, that are not based upon reliance on the alleged misrepresentations, may not be subject to dismissal on that ground. However, since on a motion to dismiss the Court must indulge every inference in favor of the pleadings, it is not clear that the counterclaims, as drafted, are barred. Therefore, MCI's motion to dismiss must be denied.

 The only other issue left for the Court to resolve is whether to stay MCI's collection action pending the FCC's evaluation of Dominican's unreasonable practices counterclaim. In *Reiter v. Cooper,* 507 U.S. at 263, 113 S.Ct. at 1217–18, the Supreme Court held that an unreasonable rate issue could not be asserted as a defense, but was properly raised as a counterclaim, and could proceed to separate judgment. While that case was an attack on the reasonableness of a rate itself, the reasoning is equally applicable here, where the failure to deviate from a filed rate is at issue. One factor the Supreme Court indicated the Court should consider in deciding whether to stay the collection action is solvency. Here, there is no indication that MCI is insolvent and could not respond on a counterclaim for damages at some point in the future. However, it is less clear whether Dominican will be in a similar position to respond to MCI's collection action in the future. That being so, and since tariff rates

not disapproved by an agency are at the very least *prima facie* legal rates, the equities favor allowing MCI to proceed to separate judgment on its principal claim.[4]

## CONCLUSION

For the reasons set forth above, MCI's motion to dismiss is denied, Dominican's unreasonable practice counterclaim is stayed pending an FCC determination of that issue, and Dominican's cross-motion to stay all proceedings herein is denied.

It is **SO ORDERED.**

---

4. Dominican's motion requested that the Court stay all further proceedings. Since the Court declines to stay MCI's collection action pending referral of the unreasonable practice counter-

claim, Dominican is free to prosecute its remaining counterclaims so long as they do not implicate matters inextricably connected to the unreasonable practices counterclaim.