AT & T COMMUNICATIONS OF
VIRGINIA, INC., Plaintiff,

v.

BELL ATLANTIC–VIRGINIA,
INC., Defendant.

Civ. Action No. 98–1721–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 5, 1999.

**494**

Mary Catherine Zinser, Mays & Valntine, McLean, VA, for plaintiff.

Richard C. Sullivan, Jr., Alexandria, VA, for defendant.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

Before the Court are the parties' cross-motions for summary judgment. There are three issues now before the Court: (1) whether a settlement agreement between the parents of these parties prohibits AT & T Communications of Virginia, Inc. (AT & T) from bringing this action; (2) whether this action should be dismissed without prejudice as a result of the Supreme Court's recent decision in *AT & T Corp. v. Iowa Util. Bd.*, —— U.S. ——, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999); and (3) whether the Telecommunications Act of 1996 (1996 Act) requires Bell Atlantic–Virginia, Inc. (Bell Atlantic) to offer dialing parity for intrastate intraLATA toll calls in the absence of implementing regulations by the FCC or the Virginia State Corporation Commission. The parties agree that there are no disputes as to material facts and we find the issues ripe for summary judgment.

## BACKGROUND

LATAs (local access transport areas) are contiguous geographical areas by which telephone service is organized. Most states have more than one LATA and some LATAs cover parts of more than one state. Long-distance calls are those between two LATAs, or inter-LATA calls. Local calls are calls within a close geographical area that is generally smaller than a single LATA. IntraLATA toll calls are calls within the same LATA but beyond the range for local calls. The instant action is solely concerned with intrastate intraLATA toll calling.

After the break-up of AT & T in 1982, Bell Atlantic and other Bell operating companies (BOCs)[1] were granted monopolies in intraLATA toll markets but were prohibited from carrying interLATA toll calls. In 1995, the Virginia State Corporation Commission (SCC) partially eliminated Bell Atlantic's monopoly by authorizing other carriers to provide intraLATA toll calls, but only on an access code basis. This means that while Bell Atlantic is the default carrier when a customer dials "1" plus the area code and phone number, that customer can use the services of a separate carrier by first dialing an access code, usually in the form "10–10–è# ". Implementation of "dialing parity" means offering customers the choice of presubscribing, or choosing a different carrier to be the default carrier for toll calls. Bell Atlantic has not implemented dialing parity for intrastate intraLATA toll calls.

On February 8, 1996, Congress passed the 1996 Act in order "to foster competition in local telephone service." *GTE South Inc. v. Morrison*, 957 F.Supp. 800, 801 (E.D.Va. 1997). In doing so, it "ended the longstanding regime of state-sanctioned monopolies ... [by] fundamentally restructur[ing] local telephone markets." *AT & T Corp. v. Iowa Util. Bd.*, —— U.S. ——, 119 S.Ct. 721, ——, 142 L.Ed.2d 835, 1999 WL 24568, *3 (1999). "States may no longer enforce laws that impede competition, and incumbent LECs are subject to a host of duties intended to facilitate market entry." *Id.* One of these duties applicable to all LECs is "[t]he duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service". 47 U.S.C.A. § 251 (Supp.1998). Another provision of the 1996 Act requires BOCs that exercise the authority to provide interLATA (*i.e.,* long distance) services to provide intraLATA toll dialing parity. *See id.* at § 271(e)(2)(A). However, BOCs that were not required to implement intraLATA

---

1. BOCs constitute a subset of local exchange carriers (LECs) with special responsibilities and protections under the 1996 Act. Bell Atlantic is an LEC, a BOC, and an incumbent local exchange carrier under the 1996 Act.

toll dialing parity by December 19, 1995 and that are not located in single-LATA states are protected from any state action requiring implementation of intraLATA toll dialing parity until the earlier of their being authorized to provide interLATA services or February 8, 1999. *See id.* at § 271(e)(2)(B).

In accord with its obligations under the 1996 Act, *see id.* at 251(d)(1), the FCC promulgated regulations providing that "[a] LEC that does not begin providing in-region, interLATA or in-region, interstate toll services in a state before February 8, 1999, must implement intraLATA and interLATA toll dialing parity throughout that state on February 8, 1999...." 47 C.F.R. § 51.211 (1997). Consistent with the FCC regulations, Bell Atlantic submitted an IntraLATA Presubscription Implementation Plan to the Virginia SCC on December 4, 1996. The Virginia SCC approved this plan on May 9, 1998 in an order requiring intraLATA toll dialing parity by February 8, 1999.

Lawsuits filed by incumbent LECs across the country challenging the FCC's regulations, including § 51.211, were consolidated in the United States Court of Appeals for the Eighth Circuit. In August 1997, that Court vacated the FCC's regulations as they affected intrastate communications, finding that the FCC did not have jurisdiction to regulate wholly intrastate activity. *See California v. F.C.C.,* 124 F.3d 934, 938 (8th Cir.1997), *rev'd, AT & T Corp. v. Iowa Utils. Bd.,* —— U.S. ——, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). On November 6, 1998, relying on this ruling and at Bell Atlantic's request, the Virginia SCC suspended its previous order setting the February 8, 1999 deadline. On January 25, 1999, the United States Supreme Court reversed the Eight Circuit, finding that the FCC has jurisdiction to promulgate rules regarding intrastate communication pursuant to provisions of the 1996 Act. The FCC will officially regain jurisdiction to regulate intrastate intraLATA toll calls once the mandate is returned to the Eighth Circuit on February 19, 1999 and the court vacates its order vacating the FCC regulations. In the interim, there are no valid federal or state regulations requiring intrastate intraLATA dialing parity.

Bell Atlantic asserts that it will not implement intrastate intraLATA toll dialing parity until it receives authority to offer interLATA services or it is ordered to do so by the FCC or the Virginia SCC. AT & T brings this action for declaratory relief, arguing that Bell Atlantic is required by the 1996 Act to provide dialing parity for intrastate intraLATA toll calls by February 8, 1999; for an injunction requiring Bell Atlantic to take the necessary steps to provide dialing parity by that date; and for an award of damages for any delay that might result from Bell Atlantic's failure to implement dialing parity on time.

*ANALYSIS*

*I. Effect of a Previous Settlement Agreement*

Before reaching the merits of AT & T's claim, Bell Atlantic contends that AT & T is prevented from maintaining this action by a 1996 settlement agreement releasing Bell Atlantic from any and all claims relating to intraLATA dialing parity. On April 4, 1995, AT & T filed a counterclaim in a suit brought against it by Bell Atlantic Corporation, Bell Atlantic's parent, alleging, in part, that the parent had violated state and federal antitrust laws by refusing to implement intraLATA toll dialing parity. *See* Def.Ex. B, *Bell Atlantic Corp. v. AT & T Corp,* Answer, Counterclaims and Jury Demand, Docket No. 95–610 (D.N.J. Apr. 4, 1995). As part of the settlement of that action, entered on January 23, 1996, AT & T released Bell Atlantic Corporation and all of its subsidiaries, including Bell Atlantic,

> from (i) the Counterclaim and (ii) any and all manner of claims, ... liabilities, damages, potential actions, causes of action, suits, ... and controversies of any kind and nature whatsoever, at law, in equity, or otherwise, whether known or unknown, which have arisen or might subsequently arise directly or indirectly from the allegations set forth in the Counterclaim.

*See* Def.Ex. A, Settlement Agreement at ¶ 2(a). The agreement provided an exception to the general release for

> any pending proceeding before any regulatory body or ... AT & T's ability to bring

or participate in future regulatory proceedings provided that, in such pending or future proceedings, AT & T does not (a) claim that the AT & T Released Claims violate federal antitrust laws or state antitrust, fair competition or other trade regulations laws or (b) seek damages, refund or reimbursement for the AT & T Released Claims.

*Id.* The agreement is governed by Delaware law. *See id.* at ¶ 3.

Bell Atlantic asserts that under this settlement agreement, AT & T gave up its right to pursue any claims related to intraLATA dialing parity, regardless of when the conduct occurred, when the cause of action arose, or when the cause of action was created. Because this action relates to intraLATA dialing parity and because this is not a regulatory proceeding, Bell Atlantic contends that AT & T has no right to bring it. Although it maintains that notice of future causes of action is irrelevant given the breadth of this release, Bell Atlantic also argues that the agreement was signed less than three weeks before the 1996 Act was passed, demonstrating that AT & T had knowledge of the 1996 Act's intraLATA dialing parity provisions and did not reserve the right to sue under those provisions.

■ AT & T responds that the settlement agreement did not release claims arising from post-release conduct or as a result of subsequently-enacted statutes. Furthermore, if Bell Atlantic's construction of the agreement is accurate, it is void as against public policy. AT & T first asserts that even extremely broad general releases cannot cover post-release conduct. There is no controlling Delaware authority on that point,[2] although Delaware law recognizes the validity of broad general releases. In *Hob Tea Room, Inc. v. Miller*, 89 A.2d 851, 856 (Del. 1952), for example, the Delaware Supreme Court discussed

the concept of a general release, one which is intended to cover everything—what the parties presently have in mind, as well as what they do not have in mind, but what

may, nevertheless, arise. Such general releases are in common use, and their potency, if it renders them too dangerous for careless handling, is at the same time a constant boon to business and courts. Their validity is unchallenged.

More importantly, AT & T's argument would lead to the illogical conclusion that parties could not agree to release claims based on future conduct even when the releases were designed to settle lawsuits requesting injunctions. In such cases, the former plaintiff could turn around the day after the settlement and bring a new action based on the same conduct. No action requesting injunctive relief could ever be resolved in a way that allowed the conduct at issue to continue, short of a full trial. *See Main Line Theatres, Inc. v. Paramount Film Distrib. Corp.*, 298 F.2d 801, 803 (3d Cir.) *cert. denied*, 370 U.S. 939, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962) ("Certainly, a defendant offering a sum in settlement of a suit asking, among other things, for an injunction against certain conduct, would not understand that a similar demand could be asserted the day after settlement."). We find that general releases arising out of actions seeking injunctive relief can cover prospective conduct of the same character as that complained of in the underlying action. In the instant action, the language of the 1996 settlement agreement is clearly broad enough to address future conduct.

AT & T next argues that even if the release does cover post-release conduct, it cannot operate to prohibit actions based on subsequently-enacted statutory rights. AT & T contends that to be an effective waiver of present statutory rights, a contract must include express and unmistakable language referring to those rights. *See Communication Workers of America*, 644 F.2d 923, 928 (1st Cir.1981). Therefore, it must also be the case that waivers of statutory rights that have not yet been created must be stated with particularity as well. Furthermore, by reserving the right to bring future regulatory actions regarding this same issue, AT & T

---

**2.** AT & T cites several cases on point, none of which address Delaware law. *See, e.g., Scheck v. Burger King Corp.*, 756 F.Supp. 543 (S.D.Fla.

1991) (applying Florida law); *Massey v. Exxon Corp.*, 942 F.2d 340 (6th Cir.1991) (applying Kentucky law).

demonstrated that it did not intend to forego all possible means of obtaining intraLATA toll dialing parity. Rather, it only intended to give up its causes of action under federal and state antitrust laws.

Bell Atlantic counters that the language of the agreement and relevant case law suggest a different conclusion. First, under the agreement, AT & T released "any and all manner of claims ... whether known or unknown, which have arisen or might subsequently arise." Def.Ex. 1, Settlement Agreement at ¶ 2.a. This language is addressed to any claims, even those that do not exist at the time of the agreement, that are based on "the allegations set forth in the Counterclaim," including the failure to implement intraLATA toll dialing parity. *Id.* Furthermore, it would be absurd to require a general release to specifically identify all future statutory rights that might be covered. Finally, Bell Atlantic contends that general releases, by their nature, should be construed broadly to cover all claims not specifically excepted. *See Coakley & Williams Constr., Inc. v. Structural Concrete Equip., Inc.,* 973 F.2d 349, 353 (4th Cir.1992) ("[B]ecause the release was very broadly phrased, it seems that if the parties intended to allow any future claims against each other, they would have done so specifically."); *Virginia Impression Prods. Co. v. SCM Corp.,* 448 F.2d 262, 265 (4th Cir.1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 945, 30 L.Ed.2d 811 (1972) ("[T]he very nature of a general release is that the parties desire to settle all matters forever."). Therefore, the release's specific exception for regulatory proceedings actually demonstrates that no other means of addressing this issue are permissible.

We do not need to address the issue of whether general releases can ever preclude claims based on subsequently-enacted statutes because we find that this particular release could not preclude the particular claims AT & T asserts here. As the parties acknowledge, courts have frequently refused to accept waivers of rights under certain federal statutes designed to further the public interest. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) ("[I]n the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."); *Riley v. American Family Mut. Ins. Co.,* 881 F.2d 368, 371–72 n. 6 (7th Cir.1989) ("Prospective waivers [of causes of action under Title VII] would be unenforceable."); *Valenti v. International Mill Servs. Inc.,* 610 F.Supp. 36, 38 (E.D.Pa.1985) (regarding Age Discrimination in Employment Act); *Babbitt v. Norfolk & Western Ry. Co.,* 104 F.3d 89, 91–92 (6th Cir.1997) (regarding Federal Employers' Liability Act based on specific statutory provision); *Goodman v. Epstein,* 582 F.2d 388, 402 n. 42 (7th Cir. 1978) (Securities Exchange Act of 1934). *But see Virginia Impression,* 448 F.2d at 265 ("Although private enforcement is a hallmark of the antitrust laws, it is not mandatory and federal policy does not prohibit agreements among private individuals releasing such claims.") (citations omitted). Where statutes rely on the ability of private parties to assert their statutory rights in order to vindicate the public interest, those parties cannot waive those rights by contract. This seems especially true where the waiver occurred before those rights even existed. Therefore, we find that the settlement agreement does not preclude AT & T from bringing this action, because the purpose behind the 1996 Act was ultimately to benefit the general public by fostering competition among carriers.

**II. Whether this Action Should Be Dismissed Without Prejudice**

Bell Atlantic also contends that because the Supreme Court's decision in the *Iowa Utils. Bd.* case will eventually revest the FCC with the authority to order intrastate intraLATA toll dialing parity, this Court should defer to the FCC's jurisdiction and dismiss this action without prejudice. Under the doctrine of primary jurisdiction, Bell Atlantic asserts that claims "properly cognizable in court that contain some issue within the special competence of an administrative agency" should be dismissed pending the outcome of the agency's adjudication, *Reiter*

*v. Cooper,* 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993), out of "a concern for uniform outcomes" and to allow the "agency to apply its expert judgment." *Allnet Communication Serv., Inc. v. National Exchange Carrier Ass'n, Inc.,* 965 F.2d 1118, 1120 (D.C.Cir.1992). Because Congress clearly gave the FCC "rulemaking authority to carry out" the provisions of § 251, *Iowa Util. Bd.,* —— U.S. at ——, 119 S.Ct. 721, 728–30, 1999 WL 24568 at *5–6, and because there is a substantial risk of inconsistent decisions if we do reach the merits of this action, we should defer to that body regarding its implementation.

■ AT & T responds that the doctrine of "[p]rimary jurisdiction does not extend to a legal question that is within the conventional competence of the courts" when the Court will not need "the FCC's technical or policy expertise." *National Communications Ass'n v. American Telephone and Telegraph Co.,* 46 F.3d 220, 223 (2d Cir.1995). In that case, the Court identified four factors to consider in determination whether to apply the doctrine:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
>
> (2) whether the question at issue is particularly within the agency's discretion;
>
> (3) whether there exists a substantial danger of inconsistent rulings; and
>
> (4) whether a prior application to the agency has been made.

*Id.* at 222. Because this action only raises a straightforward question of statutory construction, something that is "manifestly 'within the conventional competence of the courts,'" *Trans–Allied Audit Co. v. Ram Trans, Inc.,* 760 F.Supp. 848, 851 (D.Colo. 1989), *quoting Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 305, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), AT & T asserts that the doctrine of primary jurisdiction does not apply to the instant action.

"No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). This action presents a rather unique situation relative to the cases cited by the parties. Here, we are not asking whether a court should step in and decide an issue before an agency has the opportunity to do so. Rather, the FCC has already ruled on the issue before us and promulgated regulations designed to accomplish exactly what AT & T requests in this action. Before those regulations were vacated, Bell Atlantic proposed and the Virginia SCC ordered an implementation schedule to meet the February 8, 1999 deadline. In other words, the agency had issued rules but was, and is, prevented from implementing them because of court rulings. In a sense, this action comes to us in exactly the opposite posture as most cases in which the doctrine of primary jurisdiction is raised.

Because the four-prong test identified in *National Communications* provides a good framework for analyzing whether the doctrine of primary jurisdiction should be applied, we now will apply that test in evaluating this issue.

### A. Is the Question Within the Conventional Experience of Judges?

Under the first prong, we find that the question before us is essentially a question of statutory interpretation that is within the conventional experience of judges. AT & T asks us to determine whether the simple language of the 1996 Act requires the implementation of intrastate intraLATA toll dialing parity by February 8, 1999.

### B. Is the Question Particularly Within the Agency's Discretion?

The second prong of the test asks whether the question at issue is placed particularly within the agency's discretion. This question goes to the heart of the dispute between these parties and cannot be answered without reaching the merits of the claim before us. The issue before the Court is whether the 1996 Act creates a statutory requirement

that BOCs implement intrastate intraLATA toll dialing parity by February 8, 1999 in the absence of regulations or orders from the FCC or states requiring them to do so.

AT & T contends that the 1996 Act unambiguously requires Bell Atlantic to offer dialing parity for all intraLATA toll calls, including intrastate intraLATA toll calls, by February 8, 1999. Indeed, the 1996 Act creates a duty on behalf of all LECs, including Bell Atlantic, "to provide dialing parity to competing providers of telephone exchange service and telephone toll service." 47 U.S.C.A. § 251(b)(3) (Supp.1998). Section 271(e)(2)(B) includes the following limitation:

> ... a State may not require a Bell operating company to implement intraLATA toll dialing parity in that State before a Bell operating company has been granted authority under this section to provide interLATA services originating in that State or before 3 years after February 8, 1996, whichever is earlier.

AT & T argues that § 251(b)(3) creates an absolute duty to implement dialing parity and that § 271(e)(2)(B) only postpones enforcement of this requirement until February 8, 1999 at the latest. It asserts that any other interpretation of these two provisions would nullify the express duty Congress placed on LECs to implement dialing parity.[3]

By contrast, Bell Atlantic contends that § 251(b)(3) does not create any affirmative duty in the absence of FCC or state regulations. It asserts that Congress specifically gave the authority to implement the 1996 Act's requirements to the FCC and, with limitations, to the states. Bell Atlantic further argues that the plain language of § 271(e)(2) contradicts AT & T's interpretation of the statute. Section 271(e)(2)(B) prohibits states from requiring BOCs to implement intraLATA toll dialing parity before the earlier of the date the BOC receives authorization to provide interLATA services or February 8, 1999. This provision also specifically allows states to issue orders requiring intraLATA toll dialing parity before February 8, 1999 or before interLATA services are authorized, "so long as such order does not take effect until after" those dates. Bell Atlantic argues that this provision clearly contemplates that states will have discretion as to whether to require intraLATA toll dialing parity after February 8, 1999. This could not be the case if § 251(b)(3) created a self-executing duty that would bind BOCs in the absence of implementing regulations.

We find that the 1996 Act establishes in clear, unmistakable language a duty on behalf of all LECs, including Bell Atlantic, to implement intrastate intraLATA toll dialing parity.[4] Equally clear, however, is that Congress left implementation of this duty to the FCC, see § 251(d)(1), and, with limitations, to the states. See § 271(e)(2)(B). The statute does not include sufficient instructions as to the manner or timing for carrying out this duty by which any court could enforce it directly. We find that § 271(e)(2)(B) is, by its unambiguous terms, a restriction solely on the authority of states as to the earliest possible time at which they can order certain BOCs to implement intraLATA dialing parity. There is simply no way to read this provision either as imposing a deadline by which intraLATA toll dialing parity is

---

3. AT & T also notes that Bell Atlantic's parent has previously acknowledged its obligation to initiate toll dialing parity by February 8, 1999. In a November 12, 1996 press release, Bell Atlantic Corporation stated that the 1996 Act requires its BOCs to provide dialing parity "for regional toll calls ... when [they] can provide long distance service or by February, 1999, whichever comes first." Pl.Ex. C. Furthermore, in its 1997 annual report, Bell Atlantic Corporation stated that it expected "to offer intraLATA presubscription in Maryland, Massachusetts and Virginia coincident with our offering of long distance services in those states, or by February 8, 1999, as required by the 1996 Act." Pl.Ex. F at 21. Although it recognizes that these statements are not valid legal stipulations, see United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, 508 U.S. 439, 448, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), AT & T asserts that they demonstrate that Bell Atlantic really understands the 1996 Act itself, and not just the FCC's regulations, to require dialing parity by February 8, 1999.

4. Black's Law Dictionary defines duty as "[a] human action which is exactly conformable to the laws which require us to obey them. Legal or moral obligation. Obligatory conduct or service. Mandatory obligation to perform." Black's Law Dictionary 453 (5th ed.1979).

required or as a limitation on the FCC's ability to implement intraLATA toll dialing parity.

AT & T insists that our interpretation of the 1996 Act essentially nullifies the duties imposed in § 251(b). We disagree. The duty to provide intrastate intraLATA toll dialing parity is clear and the FCC's obligation to implement that duty is equally clear. If the FCC fails to respond as the statute requires when it again has jurisdiction to address these issues,[5] AT & T can pursue an action against it. Because this analysis resolves the merits of this action in a way that makes the remainder of the primary jurisdiction analysis moot, it is unnecessary to address the third and fourth prongs of that analysis.

### CONCLUSION

For the reasons stated above, we will grant summary judgment in favor of defendant.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

---

**5.** Our decision relies, in part, on the reality that the FCC will again have jurisdiction to address these issues in two weeks. Were the FCC to be prevented from exercising its jurisdiction in some way, it might be appropriate for this or another court to re-examine this issue. While we find that the 1996 Act does not require implementation of intrastate intraLATA toll dialing parity by any particular date, we find that it does require such implementation. If Congress' chosen means of enforcing this duty, namely FCC regulations, were unavailable for some reason, it might be appropriate for a court to step in.