**ADVAMTEL, LLC, et al., Plaintiffs,**

v.

**SPRINT COMMUNICATIONS CO., Defendant.**

**No. Civ.A. 00–1074–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

July 17, 2000.

---

Douglas P. Lobel, Joseph F. Yenouskas, Jonathan E. Canis, David A. Konuch, Kelley Drye & Warren, L.L.P., Washington, D.C., William A. Escobar, Christopher C. Palermo, Kelley Drye & Warren, L.L.P., New York City, for plaintiffs.

Richard Cullen, J. William Boland, Laura R. White, William H. Baxter, II, McGuire Woods Battle & Booth, L.L.P., Richmond, VA, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This severed action is a claim brought by sixteen[1] competitive local exchange carriers ("CLECs"), against a long distance carrier, Sprint Communications Company ("Sprint"),[2] for fees due pursuant to published tariffs. Sprint's response, embodied in both an affirmative defense and counterclaim, is to attack the reasonableness of the tariff rate and, by threshold motion, to seek referral of all or portions of the case to the Federal Communications Commission ("FCC"),[3] and a stay or dismissal of any portions of the case not referred. For the reasons that follow, Sprint's counterclaim is referred to the FCC pursuant to the doctrine of primary jurisdiction,[4] but plaintiffs' remaining claim, which is essentially a collection action, will proceed to resolution on the merits.

### I.

The instant dispute arises from plaintiffs' thus far unsuccessful effort to collect fees allegedly owed to them by Sprint pursuant to a published tariff for use of plaintiffs' local exchange networks in routing long distance telephone calls. Accordingly, warranted here is a brief description of the relationship between CLECs, such as plaintiffs, and long-distance carriers, such as Sprint.

Local exchange carriers ("LECs") provide local telephone service to subscribers in the areas where they operate. The local telephone network begins with local "loops"—the cable strung on telephone poles or buried underground—that connect each telephone subscriber in a LEC's service area to local "central office" switches. These switches are, in turn, connected to each other through various transport facilities and serve to route calls along the network. LECs own and control most of the plant and facilities used to provide local telephone service in their geographic area.

There are two types of LECs, CLECs, such as plaintiffs, and established or incumbent LECs. Incumbent LECs, such as Bell Atlantic, operated as monopolies in a given area until the local phone service market was opened by the Telecommunications Act of 1996, which provided for the emergence of new LECs, the CLECs, to compete with the so-called "Baby Bells."[5] See 47 U.S.C. § 251 et seq.

Local telephone networks are needed not only for making local calls, but also to originate and terminate long-distance calls. Typically, when an end user dials a long-distance number, the LEC serving that customer routes it to the customer's long-distance carrier. This service is referred to as "originating access." The long-distance carrier then routes the call to the local carrier serving the called customer and that local carrier completes the call by routing it to the called customer. This service is referred to as "terminating access." Thus, long-distance calls generally cannot be completed without originating and terminating access from the local telephone network. Thus, Sprint and other

---

1. Although the First Amended Complaint identifies eighty-nine plaintiffs, there are essentially only sixteen distinct plaintiffs and the remaining seventy-three are related operating subsidiaries of one or another of the sixteen distinct parent companies.

2. Originally, plaintiffs' claim included AT & T as a defendant. By Order dated June 23, 2000, the claims against AT & T and Sprint were severed. See Advamtel LLC, et al. v. AT & T Communications Co., et al., Civ.A. No. 00–643–A, Order dated June 23, 2000.

3. The FCC is the expert regulatory agency on affairs relating to telecommunications carriers. See AT & T Corp. v. PAB, Inc., 935 F.Supp. 584, 590 (E.D.Pa.1996).

4. See, e.g., Environmental Tech. Council v. Sierra Club, 98 F.3d 774, 789 (4th Cir.1996).

5. After the break-up of AT & T in 1982, the Bell operating companies were granted monopolies in the local phone service market. See AT & T Communications of Va., Inc. v. Bell Atlantic–Virginia, 35 F.Supp.2d 493, 494 (E.D.Va.1999).

long–distance carriers must order access services from the LEC, whether a CLEC or an incumbent LEC, that serves the end user. These LECs then impose access charges on the long–distance carriers in exchange for access to the local network to originate and terminate long-distance calls. Because the incumbent LECs' wires are usually the only connection between a household or business and the rest of the local network, and because duplicating those wires would be prohibitively expensive, the CLECs generally interconnect with the incumbent LECs' local network in providing local service, and the long-distance carriers' networks generally connect to the incumbent LEC's network, not the CLEC's network. Thus, when an end user who subscribes to a CLEC's local service places a long-distance call, the CLEC directs the call to the long-distance carrier's network via the incumbent LEC's facilities and equipment. The CLECs impose access charges on long-distance carriers for calls that travel over the incumbent LECs' network, but only after the fact. Thus, when a long-distance carrier receives calls from an incumbent LEC's network, it does not know, at that time, the identity of the CLEC or incumbent LEC that directed the call to the long-distance carrier.

Pursuant to FCC requirements, telecommunications carriers, such as plaintiffs, file tariffs which, upon FCC approval, govern their rate structure.[6] *See* 47 U.S.C. § 153(h); *MCI Telecomm. Corp. v. Dominican Communication Corp.*, 984 F.Supp. 185, 187 (S.D.N.Y.1997). Tariffs have been defined as "essentially offers to sell on specified terms, filed with the FCC and subject to modification or disapproval by it." *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487 (7th Cir.1998). As tariffs

are filed with the FCC, they are available for public view. *See MCI Telecomm. Corp. v. FCC*, 765 F.2d 1186, 1189 (D.C.Cir.1985). Plaintiffs filed tariffs with the FCC, and these tariffs governed their dealings with other common carriers, such as Sprint. *See Cincinnati Bell Telephone Co. v. Allnet Communication Serv. Inc.*, 17 F.3d 921, 924 n. 4 (6th Cir.1994).

Sprint began receiving originating and terminating access service from plaintiffs in April 1997. Since that time, plaintiffs have submitted invoices to Sprint, containing information reflecting the access services utilized by Sprint and the applicable tariffs. Since June 1999, however, Sprint has refused to pay the tariff rates for these access services, claiming that plaintiffs' tariff rates are "unreasonable."[7] As a result, Sprint contends that it is not obligated to pay the published tariff rates. Instead, Sprint says it is obligated to pay only a reasonable rate. Thus, for the past year Sprint has paid plaintiffs at the rate it deems reasonable. Because of this, plaintiffs claim that Sprint owes them approximately $2,864,303, the difference between the amount due under the published tariff rates and the amount Sprint has paid.

In April, plaintiffs filed a two-count complaint against Sprint; Count I seeks to collect access charges at the published tariff rate for originating and terminating long-distance calls and Count II states a claim for violations of the Telecommunications Act, 47 U.S.C. § 201, unjust and unreasonable practices by a common carrier. In June, Sprint filed a counterclaim, in which it stated claims for (i) violations of § 201 the Telecommunications Act (charging unreasonable and unjust tariffs) and (ii) breach of contract.[8] Sprint now moves

---

6. In lieu of providing service under a tariff, carriers may enter into bilateral contracts with other carriers for the provision of services at a mutually agreed-upon rate. *See* 47 U.S.C. § 211. No such contracts are in issue here; plaintiffs' claims rest solely on published tariffs.

7. The Telecommunications Act forbids telecommunications carriers from engaging in any "unjust" or "unreasonable" practice or

from charging "unreasonable" rates. *See* 47 U.S.C. §§ 201(b), 201(a).

8. Sprint also asserted the unreasonableness of plaintiffs' tariff rates as an affirmative defense, but claims challenging the reasonableness or fairness of common carrier rates asserted in response to collection actions by the common carrier are properly considered counterclaims, not affirmative defenses, be-

to refer certain issues to the FCC under the doctrine of primary jurisdiction and to stay or dismiss the remainder of the proceedings.

## II.

■ When a claim pending before a court "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body," the doctrine of primary jurisdiction mandates suspension of judicial proceedings "pending referral of such issues to the administrative body for its views." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The purpose of this doctrine is to "coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional expertise of judges or cases which require the exercise of administrative discretion." *Environmental Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir.1996). By dividing decision-making authority, the doctrine serves to promote "proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Western Pac.*, 352 U.S. at 63, 77 S.Ct. 161. It also serves judicial economy because the dispute may be decided by the administrative agency and obviate the need for court intervention. *See Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir.1991).

■ There is no fixed formula for determining when primary jurisdiction applies. *See AT & T Communications of Va., Inc. v. Bell Atlantic–Virginia, Inc.*, 35 F.Supp.2d 493, 498 (E.D.Va.1999). In every case, "the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in

the particular litigation." *Id.* (quoting *Western Pac.*, 352 U.S. at 64, 77 S.Ct. 161). To aid in this determination, courts have adopted the following four-factor test:

1. Whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

2. Whether the question at issue is particularly within the agency's discretion;

3. Whether there exists a substantial danger of inconsistent rulings; and

4. Whether a prior application has been made to the agency.

*See AT & T Communications*, 35 F.Supp.2d at 498. Courts must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings. *See Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 321, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973).

A relevant example illustrates the application of the doctrine. One issue typically referred to the FCC under the primary jurisdiction doctrine is the reasonableness of a carrier's tariff (i) because that question requires the technical and policy expertise of the agency,[9] and (ii) because it is important to have a uniform national standard concerning the reasonableness of a carrier's tariff, as a tariff can affect the entire telecommunications industry,. *See MCI Telecommunications Corp. v. Ameri–Tel, Inc.*, 852 F.Supp. 659, 665 (N.D.Ill. 1994).

On the other hand, the doctrine of primary jurisdiction does *not* apply to an action seeking the enforcement of an established tariff. Because a tariff is essentially an offer to contract,[10] such an action

---

cause an unreasonableness claim is a separate cause of action authorized by statute. *See Frontier Commun. of Mt. Pulaski, Inc. v. AT & T Corp.*, 957 F.Supp. 170, 174 (C.D.Ill.1997) (citing *Reiter v. Cooper*, 507 U.S. 258, 261–62, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993)).

**9.** *See, e.g., National Communications Ass'n., Inc. v. AT & T Co.*, 46 F.3d 220, 223 (2d Cir.1995); *AT & T Corp. v. PAB*, 935 F.Supp. 584, 590 (E.D.Pa.1996).

**10.** *See Cahnmann*, 133 F.3d at 487.

is simply one for the enforcement of a contract. As such, enforcement of a tariff to collect amounts due under it is well within the ordinary competence of courts. *See PAB,* 935 F.Supp. at 590 ("Contract and tariff enforcement is clearly within the scope of this Court's expertise and does not warrant referral."). This principle governs the resolution of the instant action: to the extent that this case is merely an action to enforce an established tariff, as plaintiffs contend, there is no need to refer issues to the FCC. But, if this case presents a challenge to the reasonableness of plaintiffs' tariffs, as Sprint argues, referral to the FCC would be appropriate, for "the administrative agency is best suited to make that determination." *Ameri-Tel,* 852 F.Supp. at 665.

■ Manifestly, this case is neither a simple enforcement action, nor is it purely a challenge to the reasonableness of plaintiffs' tariffs; rather, it is both. Plaintiffs seek enforcement of established tariffs, and Sprint seeks a determination that plaintiffs' tariffs are unreasonable. Sprint's counterclaim, therefore, is properly referred to the FCC on primary jurisdiction grounds because, applying the four factors, (i) the reasonableness of a tariff involves policy considerations within the FCC's area of expertise, (ii) rate reasonableness is an issue particularly within the FCC's discretion,[11] and (iii) leaving the issue to the courts could result in inconsistent adjudications.[12] Consequently, as noted above, courts have routinely opted to refer claims challenging the reasonableness of a tariff to the FCC. *See, e.g., National Communications Ass'n,* 46 F.3d at 223; *Richman Bros. Records v. U.S. Sprint Communications Co.,* 953 F.2d 1431, 1435 n. 3 (3d Cir.1991); *IPCO Safety Corp. v. WorldCom. Inc.,* 944 F.Supp. 352, 356 (D.N.J.1996); *PAB,* 935 F.Supp. at 590; *Ameri-Tel,* 852 F.Supp. at 665. Plaintiffs' claim, on the other hand, need

not be referred to the agency because it simply seeks enforcement of an established tariff, and that is well within the ordinary competence of a court. *See National Communications Ass'n,* 46 F.3d at 223 ("[P]rimary jurisdiction does not apply to cases involving enforcement of a tariff. . . ."); *PAB,* 935 F.Supp. at 590. As a result, Sprint's counterclaim, and only Sprint's counterclaim,[13] must be referred to the agency under the doctrine of primary jurisdiction. Referring the counterclaim while retaining jurisdiction over the original claim in this manner is entirely appropriate because a counterclaim, unlike an affirmative defense, can be adjudicated separately from the plaintiffs' claim to which it applies. *See Reiter v. Cooper,* 507 U.S. 258, 265, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993); *Dominican Communication Corp.,* 984 F.Supp. at 191.

III.

■ The remaining issue is whether plaintiffs' claim should be stayed pending the FCC's resolution of Sprint's counterclaim. A court may, in its discretion, stay proceedings pending determination by an administrative agency pursuant to the doctrine of primary jurisdiction. *See Reiter,* 507 U.S. at 268–69, 113 S.Ct. 1213. Whether or not to stay a claim pending the agency determination is a matter of equity. *See id.* at 270, 113 S.Ct. 1213. Among the factors a court should balance are (i) the relative harms caused by the delay involved in referral of a claim to an agency, (ii) whether the claim concerns rates that are presumptively legal, and (iii) the solvency of either party. *See id.* The first factor involves identifying and weighing the relative harms to the parties occasioned by delaying, or not delaying, adjudication of the unreferred claim pending the agency resolution of the referred claim. The importance of the first factor is a

---

**11.** *See PAB,* 935 F.Supp. at 591.

**12.** The fourth factor, whether there has been prior application to the FCC, is not applicable here.

**13.** Sprint's affirmative defenses will not be referred to the FCC because they are subsumed by Sprint's counterclaim. *See supra* note 8.

function of the length of time required for agency resolution of the referred claim. Because litigation before administrative agencies is typically protracted, reasonable estimates of this period of time are substantial. *See National Communications Ass'n*, 46 F.3d at 225 (finding that the FCC would likely take two to five years to resolve the case if it was referred).

■ In this case, the equities favor allowing plaintiffs' claim against Sprint to proceed on the merits while Sprint's challenge to the reasonableness of plaintiffs' tariffs is resolved by the FCC. First, although Sprint claims plaintiffs' tariff rates are unreasonable, plaintiffs' tariff rates, which have been filed with the FCC, are presumptively valid under the filed-rate doctrine. *See Dominican Communication Corp.*, 984 F.Supp. at 191 ("[T]ariff rates not disapproved by the agency are at the very least prima facie legal rates....").[14] As a result, plaintiffs had a right to collect the filed tariff rates, which Sprint should have paid. If Sprint considered the rates to be unreasonable, it should have sought relief as a separate claim, rather than resorting to self-help. *See Allnet*, 17 F.3d at 924 ("[T]he filed rate should be paid first and then relief from an unreasonable rate sought as a separate claim."). Indeed, in a similar case arising under the Interstate Commerce Act ("ICA"),[15] the Supreme Court held that, as a general rule, where only a counterclaim is referred to an agency under the doctrine of primary jurisdiction, the principal claim should proceed to judgment because "referral of an unrea-

sonable-rate issue could produce substantial delay and tariff rates not disapproved by the [agency] are legal rates, binding on [both parties]." *Reiter*, 507 U.S. at 270, 113 S.Ct. 1213. At least two other district courts, following *Reiter*, have refused to stay a collection action while the defendant's counterclaim was referred to the FCC. *See Dominican Communication Corp.*, 984 F.Supp. at 191; *Frontier Communications*, 957 F.Supp. at 175–76 (entering summary judgment for CLEC in collection action against long distance carrier despite long distance carrier's pending claim of unreasonable practices against the CLEC before the FCC). In addition, as the Supreme Court noted in *Reiter*, referral of a case to an administrative agency, such as the FCC, often considerably delays its resolution. *See Reiter*, 507 U.S. at 270, 113 S.Ct. 1213; *see also National Communications Ass'n*, 46 F.3d at 225. The possibility of such delay weighs against staying plaintiffs' claim because plaintiffs should not be forced to wait until Sprint's counterclaim winds its way through the FCC to collect monies owed to them under a validly filed tariff. Finally, it is worth noting that plaintiffs' claims are not insignificant; they claim Sprint owes them approximately $2.8 million under the filed tariff rate, which is a significant sum to small, start-up companies such as plaintiffs here.

Sprint argues unpersuasively that it would be a waste of judicial resources to allow plaintiffs' collection action to proceed to judgment when that judgment might

---

**14.** The filed rate doctrine, which is codified at 47 U.S.C. § 203(c), states, in pertinent part, that "no carrier shall charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect." This rule specifically forbids carriers from charging or collecting different compensation than that specified in an applicable tariff. *See Allnet*, 17 F.3d at 924 n. 4.

**15.** The ICA, 49 U.S.C. § 10701 *et seq.*, is similar to the Telecommunications Act in that it too requires common carriers under the Act

to file tariff rates with the applicable agency, and that such rates must be reasonable. *See* 49 U.S.C. §§ 10762, 10701(a); *Reiter*, 507 U.S. at 260–61, 113 S.Ct. 1213. Because the statutes have such a similar structure, several courts have relied on the Supreme Court's decision in *Reiter* in telecommunications cases. *See Frontier Communications*, 957 F.Supp. at 174 ("Although *Reiter* involved application of the ... ICA, the principle enunciated there applies equally to this case, which involves telecommunications laws built on the same model as the ICA."); *Allnet*, 17 F.3d at 924; *Dominican Communication Corp.*, 984 F.Supp. at 191; *Ameri–Tel*, 852 F.Supp. at 667.

ultimately be modified or even effectively vacated if the FCC determines that plaintiffs' tariff rates were unreasonable. While this is certainly a possibility, the equities favor allowing plaintiffs' claim against Sprint to proceed because plaintiffs' filed tariff rates are presumptively valid, and until those rates are deemed unreasonable by the agency, plaintiffs are entitled to seek to enforce them. No confident predictions can be made concerning the result of the FCC's adjudication of Sprint's claim of unreasonableness, nor about how long the proceeding will last. Given this, the risk that plaintiffs may, at some point, have to repay Sprint some of the money it receives in this proceedings is outweighed by the potential damage that the delay would cause plaintiffs, if the FCC ultimately upholds plaintiffs' rates. *See Frontier Communications,* 957 F.Supp. at 176. Put another way, in the circumstances at bar, the equities compel the conclusion that Sprint, and not the CLECs, should bear the risk of uncertainty concerning the reasonableness of plaintiffs' filed tariffs.

In conclusion, Sprint's counterclaim, in its entirety, is referred to the FCC under the doctrine of primary jurisdiction. In the meantime, plaintiffs' claim against Sprint will proceed to judgment on the merits. An appropriate order will issue.