**CONTINENTAL AIRLINES, INC., and Continental Express, Inc., Plaintiffs,**

v.

**UNITED AIR LINES, INC., and Dulles Airport Airline Management Council, Defendants.**

No. Civ.A. 00–684–A.

United States District Court, E.D. Virginia, Alexandria Division.

Nov. 6, 2000.

 

Vanessa Y. Chandler, Vinson & Elkins, Washington, D.C., for plaintiffs.

Andrew Abbott Nicely, Robert Lawrence Bronston, Mayer, Brown & Platt, Washington, D.C., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This federal and state antitrust and state business tort action grows out of the collective decision of defendants United Air Lines ("United") and Dulles Airport Airline Management Council ("AMC") to employ carry-on baggage "templates" to restrict the size of carry-on bags allowed to pass through security checkpoints at Washington Dulles International Airport ("Dulles"). Plaintiffs, Continental Airlines, Inc., and its wholly owned subsidiary, Continental Express, Inc., filed a five-count complaint against defendants (i) for violation of the Sherman Act, 15 U.S.C. § 1, (Count I) and its Virginia counterpart, Va. Code § 59.1–9.5, (Count II); (ii) for intentional interference with contractual relations (Count III) and with prospective economic advantage (Count IV); and (iii) for violation of the Virginia Business Conspiracy Statute, Va.Code § 18.2–499, (Count V). At issue by virtue of defendants' threshold dismissal motion are: (i) whether plaintiffs have adequately pleaded a claim for either a *per se* illegal violation of Section 1 of the Sherman Act or a violation under the Rule of Reason; (ii) whether plaintiffs' state-law claims are preempted by the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b); and (iii) whether the doctrine of "primary jurisdiction" mandates referral of this matter to the Federal Aviation Administration ("FAA"). For the reasons that follow, defendants' motion to dismiss must be denied.

### I.[1]

Delays associated with checking luggage at airport ticket counters and with collecting luggage at destination airports are endemic and major irritants of air travel. Accordingly, many airline passengers—particularly business travelers—avoid checking luggage and prefer to travel with lightweight and mobile luggage that is easy to carry onto the aircraft. This consumer preference, plaintiffs allege, creates no safety issue provided the aircraft's overhead bins accommodate and secure such stowed luggage. In fact, no federal law or regulation mandates any specific or uniform limit on the size or number of allowable carry-on bags. Instead, the FAA allows each carrier to adopt a carry-on baggage policy that is tailored to its particular circumstances. Thus, limits on carry-on baggage are at the discretion of each airline and vary among air carriers.

Plaintiffs are air carriers that transport passengers, baggage, and cargo domestically and internationally to and from Dulles, among other airports. They claim that, in response to passenger preference for avoiding the need to check baggage, they have invested approximately $15 million in outfitting their aircraft with larger overhead bins to accommodate larger carry-on bags than can be carried in the overhead bins of their competitors' aircraft. Given this, plaintiffs have adopted a liberal "gate-checking" policy on commuter flights. Plaintiffs allege that airlines compete for passengers on a variety of fronts, including, *inter alia*, price, convenience of flight schedules, type of aircraft, seating comfort, frequent-flyer incentive programs, and carry-on baggage policies. Indeed, plaintiffs allege that their carry-on baggage policies are an important element of their aggressive nationwide competitive strategy of providing high-quality service to the flying public. In this regard, plaintiffs also point out in the complaint that the FAA recognizes that "[s]ome carriers have made carry-on baggage a selling point, thereby pressuring their competition to do the same," and thus allows carriers "to find ways to provide passengers with the services they want while meeting the safety requirement for proper stowage of all bags." (¶¶ 28–29 (quoting 52 Fed.Reg. 21,472, 21,474).)[2]

United, like plaintiffs, is an air carrier that transports passengers, baggage, and cargo domestically and internationally. Also like plaintiffs, United operates at Dulles and at air terminals elsewhere in the country.

The AMC is an association of domestic and international air carriers that provide passenger service to and from Dulles. Its membership includes, in addition to United and plaintiffs, Air Canada, Air Tran, All Nippon Airways, Atlantic Coast, British Airways, BWIA, Delta Airlines, Korean Air, Lufthansa, Sabena, Spanair, Swissair, TACA, and TWA, among other air carriers.

By virtue of its position as the largest carrier at Dulles, United operates the security checkpoints at Dulles, including the metal detectors through which passengers must pass and the x-ray equipment that screens all carry-on bags and personal belongings. Control of operations at these checkpoints is shared between United and the AMC. In April of this year, a majority of the members of the AMC, at the urging of United, agreed to install baggage "templates" at the front of x-ray screening units in order to restrict the size of bags that passengers may carry on to the aircraft.[3] Passengers with bags that do not fit the template must return to the ticket counter and check the "oversized" bag.

---

1. This recitation of facts is derived from the allegations of plaintiffs' complaint, which, for purposes of the motion at bar, are taken as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

2. References to particular paragraphs in the complaint hereinafter are marked by "¶ ___."

3. The vote was 21 to 5, with plaintiffs among the 5 dissenting members.

Plaintiffs objected to the installation of these carry-on baggage templates out of concern that use of the templates to restrict the size of carry-on bags would erode the competitive advantage they enjoy owing to their policy of allowing travelers greater flexibility with respect to carry-on bags. According to plaintiffs, defendants' agreement is not grounded in any security concerns; indeed, plaintiffs point out that the FAA has instructed that airline carry-on baggage control should not be located at passenger security screening points.[4] Plaintiffs also claim that defendants' agreement to restrict the size of carry-on bags was in reality an agreement to forestall competition among air carriers on the basis of baggage-handling policies and, consequently, to deprive plaintiffs of the fruits of their investment in adopting consumer-friendly carry-on baggage policies. This decision, plaintiffs argue, is a naked restriction on the ability of individual air carriers to engage in non-price competition. As a result of this restrictive agreement, plaintiffs allege, lines at security checkpoints and ticket counters at Dulles have grown markedly, causing substantial delays that frustrate and anger passengers. Plaintiffs further allege that because their customers have been unable to take advantage of plaintiffs' liberal carry-on baggage policies, they have lost any competitive advantage stemming from their carry-on baggage policy and the profits attributable to that policy. In addition, plaintiffs claim that defendants' agreement has reduced the competitive pressure on other airlines to change their aircraft and policies to accommodate customer preferences for larger carry-on bags.

Plaintiffs' motion to dismiss the five-count complaint presents the following questions, each of which is separately addressed:

1. Whether the complaint states a valid Sherman Act Section 1 claim under the rule of *per se* illegality.

2. Whether the complaint adequately alleges a relevant antitrust market under Section 1 of the Sherman Act.

3. Whether the complaint adequately alleges antitrust injury under Section 4 of the Clayton Act.

4. Whether plaintiffs' state-law claims (Counts II–V) are preempted by the ADA.

5. Whether the doctrine of primary jurisdiction requires referral of this matter to the FAA.

**II.**

At the outset, it is well to have in mind the settled principles that govern disposition of threshold dismissal motions. In considering a motion to dismiss a complaint for "fail[ing] to state a claim upon which relief can be granted," a court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted therein as true. Fed.R.Civ.P. 12(b)(6); *see Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Higgins v. Medical College,* 849 F.Supp. 1113, 1117 (E.D.Va.1994). All reasonable inferences must be made in favor of the nonmoving party, and "a count should be dismissed only where it appears beyond a reasonable doubt that recovery would be impossible under any set of facts which could be proven." *America Online, Inc. v. GreatDeals.Net,* 49 F.Supp.2d 851, 854 (E.D.Va.1999) (citing *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)); *see Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80

4. As further evidence that the templates are unrelated to security needs, plaintiffs claim in the complaint that United has instituted a "Medallion" program that distributes an extremely limited number of "Medallions" to AMC members to give to "special passengers" to allow them to circumvent the templates. (¶ 27.) As this program allows a limited number of passengers to carry larger bags onto the aircraft, it serves to negate any claimed safety-related justifications for the templates.

**562**

(1957). A motion to dismiss tests only "the sufficiency of the complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Republican Party*, 980 F.2d at 952; and a motion to dismiss should not be granted unless the court "could not grant relief under any set of facts that the plaintiff could prove consistent with his allegations in the complaint." *Carter Machinery, Co., Inc., v. Gonzalez*, No. 97–0332–R, 1998 WL 1281295, *2, 1998 U.S.Dist. LEXIS 8106, at *5 (W.D.Va.1998) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). And, importantly, "[i]n antitrust cases in particular," the Fourth Circuit has recognized that " 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly,' " and that the standard for summary dismissal is accordingly "rigorous." *Advanced Health–Care Servs., Inc. v. Radford Community Hosp.*, 910 F.2d 139, 144 (4th Cir.1990).

### A. Plaintiffs' Antitrust Claims

An analysis of defendants' attack on the complaint's antitrust claims properly begins with a brief summary of the scope and nature of the *per se* rule and the Rule of Reason under Section 1. "[D]esigned to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as a rule of trade," [5] the Sherman Act provides that "[e]very contract, combination[,] . . . or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." [6] Yet, only those agreements or conspiracies that are "unreasonably restrictive of competitive conditions" are prohibited; Section 1 does not reach *de minimis* restraints of trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *see, e.g., State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *Advanced Health–*

*Care Servs.*, 910 F.2d at 144. Thus, a plaintiff asserting a claim for violation of Section 1 must plead: (1) an agreement or conspiracy among two or more separate entities that (2) unreasonably restrains trade and (3) affects interstate or foreign commerce. *See Estate Constr. Co, v. Miller & Smith Holding Co.*, 14 F.3d 213, 220–21 (4th Cir.1994); *American Ad Mgmt., Inc. v. GTE*, 92 F.3d 781, 788 (9th Cir.1996); *Maric v. St. Agnes Hosp. Corp.*, 65 F.3d 310, 313 (2d Cir.1995). Defendants' dismissal motion focuses on the second element—namely, that the AMC's agreement to restrict the size of carry-on bags at Dulles was an unreasonable restraint of trade. In this regard, a court is charged with the task of "form[ing] a judgment about the competitive significance of the restraint" allegedly adopted, and then applying a bifurcated analysis developed by courts in assessing whether the complaint adequately pleads an anticompetitive agreement that unreasonably restrains competition. *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). One part of this bifurcated analysis identifies categories of restraints that are deemed to be *per se* unreasonable restraints on competition. These agreements have such a "pernicious effect on competition and lack of any redeeming virtue" that they "are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *see, e.g., Broadcast Music, Inc. v. Columbia Broad. Sys.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (stating that *per se* analysis applies to an agreement that "facially appears to be one that would always or almost always tend to restrict competition and restrict output"). Thus, a court confronted with a *per se* unreasonable restraint on competi-

---

**5.** *Northern Pac. Ry. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

**6.** 15 U.S.C. § 1.

tion need not study the market involved, the effects of such an agreement on competition, or the purpose for its adoption before concluding that the plaintiff has satisfied the second element of a Section 1 violation.

The proper analytical approach "where the economic impact of certain practices is not immediately obvious," however, is the "Rule of Reason," which requires a court to analyze a restraint's impact on competition in a relevant market. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); *see, e.g., National Soc'y of Prof'l Eng'rs*, 435 U.S. at 692, 98 S.Ct. 1355. Under this mode of analysis, which is the presumptive standard for most categories of restraints, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In doing so, a court must "tak[e] into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect" in assessing the anticompetitive effect of an agreement. *State Oil Co.*, 522 U.S. at 10, 118 S.Ct. 275. "The true test of legality" under the Rule of Reason "is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Continental T.V., Inc.*, 433 U.S. at 49 n. 15, 97 S.Ct. 2549.

■ It is well to remember, however, that the *per se* and Rule of Reason analytical approaches are only judicial glosses on the ultimate inquiry under the Sherman Act into the effect of an agreement on competition.[7] In this respect, the Supreme Court has cautioned that

whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition. Under the Sherman Act the criterion to be used in judging the validity of a restraint on trade is its impact on competition.

*NCAA v. Board of Regents*, 468 U.S. 85, 104, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (footnote omitted); *see, e.g., National Soc'y of Prof'l Eng'rs*, 435 U.S. at 692, 98 S.Ct. 1355. Thus, "there is often no bright line separating *per se* from Rule of Reason analysis," for the dispositive question is whether an agreement impermissibly restrains competition. *NCAA*, 468 U.S. at 104 n. 26, 104 S.Ct. 2948. In this regard, the analysis is inevitably fact-intensive, and disposition of an antitrust suit at the pleading stage is accordingly rarely appropriate, as "only if it is beyond doubt that plaintiff can prove *no set of facts* to support its claims should defendants prevail." *Delaware Health Care, Inc. v. MCD Holding Co.*, 893 F.Supp. 1279, 1290 (D.Del. 1995) (emphasis added).

### 1. Per se *Illegality*

■ Agreements that are subject to a determination of *per se* unreasonableness are those which "facially appear[ ] to be one[s] that would always or almost always tend to restrict competition and decrease output," and which are not "designed to 'increase economic efficiency and render markets more, rather than less competitive.' " *Broadcast Music*, 441 U.S. at 19–

---

7. *See, e.g., Continental T.V., Inc.*, 433 U.S. at 49, 97 S.Ct. 2549 ("[A] judicial gloss on [the Sherman Act's] statutory language has established the 'rule of reason' as the prevailing standard of analysis."); *BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n*, 36 F.3d 664, 669 (7th Cir.1994) ("The *per se* approach to antitrust law was a judicial creation—a belief that some conduct was invariably so anti-competitive that it did not justify a detailed examination of purpose and effect.").

20, 99 S.Ct. 1551 (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)). Thus, where an agreement has a "pernicious effect on competition and lack[s] ... any redeeming virtue," *per se* treatment is appropriate. *Northern Pac. Ry.*, 356 U.S. at 5, 78 S.Ct. 514. Examples of restraints held to be *per se* illegal under Section 1 include, *inter alia,* price-fixing,[8] group boycotts,[9] tying arrangements,[10] and market-allocation agreements among competitors.[11] The common thread uniting these *per se* violations of Section 1 is that they are all "naked restraints on trade with no purpose except stifling of competition." *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). This is precisely the complaint's characterization of the defendants' agreement to restrict the size of carry-on bags at Dulles. Specifically, the complaint alleges that defendants' agreement is a restraint designed to eliminate competition for airline passengers on the basis of carry-on baggage size. The complaint further alleges that the agreement is a restraint of trade that is neither related to, nor justified by, any legitimate safety or security concerns. Indeed, the complaint also reflects that the FAA allows individual carriers to adopt carry-on baggage policies specifically tailored to a carrier's equipment, operational policies, and competitive strategy. These allegations, which are assumed to be true at this stage, are plainly sufficient to allege a *per se* violation of Section 1.

Defendants offer two reasons in support of their contention that their agreement to restrict carry-on baggage size cannot constitute a *per se* illegal restraint on trade. Neither is persuasive. First, defendants contend that *per se* illegality is the exception, rather than the rule, and that the rule's applicability is limited to certain categories of manifestly anticompetitive conduct, such as price-fixing, allocation of markets, group boycotts, and tying arrangements. *See, e.g., Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). Defendants argue that because the agreement to restrict the size of carry-on baggage does not fall into any of these categories, plaintiffs have failed to state a claim that such action is *per se* illegal under the Sherman Act. Second, defendants claim that the agreement serves a legitimate safety function and is therefore analogous to competitors' agreements to adopt industry standards, which are typically assessed under the Rule of Reason. *See, e.g., National Soc'y of Prof'l Eng'rs,* 435 U.S. at 687–90, 98 S.Ct. 1355; *Brenner v. World Boxing Council,* 675 F.2d 445, 454–55 (2d Cir. 1982).

As to the first reason, it is certainly true, as defendants contend, that *per se* analysis is the exception rather than the rule, and that *per se* analysis traditionally has been applied only to limited categories of agreements, none of which precisely describes the agreement at issue here. Yet, this general point is hardly dispositive here, for the question is not whether the specific restraint here at issue has been judicially labeled a *per se* violation in the past (it has not), but rather, whether it should now be so labeled. No authority or reason in principle limits the applicability

8. *See, e.g., Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 354, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221–23, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.,* 273 U.S. 392, 396–98, 47 S.Ct. 377, 71 L.Ed. 700 (1927).

9. *See, e.g., Fashion Originators' Guild of Am. v. FTC,* 312 U.S. 457, 468, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

10. *See, e.g., International Salt Co. v. United States,* 332 U.S. 392, 396–99, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

11. *See, e.g., Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49–50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam); *United States v. Topco Assocs.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

of the *per se* rule to the specific categories of restraints that defendants list.[12]  *Per se* treatment is appropriate not just for restraints within the specific categories defendants offer, but also to any agreement restricting competition that has no purpose other than the stifling of competition.  *See Broadcast Music,* 441 U.S. at 19–20, 99 S.Ct. 1551; *Continental T.V.,* 433 U.S. at 50, 97 S.Ct. 2549.  Thus, the question presented by the complaint's allegations is whether defendants' agreement to eliminate competition on carry-on baggage size should be accorded *per se* treatment under Section 1 because it fits the ultimate criterion for such treatment—namely, whether "surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct."  *NCAA,* 468 U.S. at 103–104, 104 S.Ct. 2948.  And, because an agreement to eliminate competition on the size of carry-on baggage has not yet been subjected to judicial scrutiny, "considerable inquiry into market conditions [is required] before the evidence justifies the presumption of anticompetitive conduct"—i.e., *per se* treatment under Section 1. *Id.* at 104 n. 26, 104 S.Ct. 2948.  This factual inquiry is inappropriately performed at the pleading stage, for while the decision as to "[w]hether to apply a *per se* or rule of reason analysis is a question of law, . . . it is predicated on a factual inquiry into the restraint's competitive effect." *National Bancard Corp. v. VISA U.S.A., Inc.,* 779 F.2d 592, 596 (11th Cir.1986); *see CSR Ltd. v. Federal Ins. Co.,* 40 F.Supp.2d 559, 565 (D.N.J.1998) ("Without discovery, the court can not make a decision as to

whether the conduct alleged is such as would always or almost always tend to restrict competition and decrease output and is, thus, per se unreasonable.") (quotation omitted).  At this stage in the proceedings, for the claim of *per se* illegality to survive threshold attack, it is sufficient that plaintiffs have alleged a restraint on trade in the form of a horizontal agreement among competitors not to compete— here, on the basis of carry-on luggage capacity—that is arguably analogous to horizontal agreements that have been held to be *per se* illegal.[13]  It must be remembered that dismissal under Rule 12(b)(6) is only appropriate where, assuming all the facts alleged in the complaint to be true, it is clear as a matter of law that no relief could be granted.  *See Hishon,* 467 U.S. at 73, 104 S.Ct. 2229.  That is not the case here.  Whether the agreement here at issue should be treated as *per se* unlawful under Section 1 must await the development of a factual record on the nature and effects of the restraint in the relevant market.

The second reason is no more persuasive than the first.  Defendants' contention that the agreement is akin to an industry safety standard founders on the complaint's allegation that the restraint has no relation to safety.  In short, the restraint is not, on the face of the complaint, analogous to a safety standard adopted by members of an industry.  Further, while the joint setting and enforcement of an industry standard is ordinarily evaluated under the Rule of Reason,[14] such action

---

**12.**  Indeed, the Supreme Court has warned that "easy labels [attached to restraints] do not always supply ready answers" in antitrust cases.  *Broadcast Music,* 441 U.S. at 8–9, 99 S.Ct. 1551.

**13.**  *See, e.g., Catalano v. Target Sales,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (horizontal agreement among beer wholesalers not to compete on the basis of short-term trade credit previously granted to retailers on beer purchases was a *per se* unreasonable restraint on trade); *cf. Smith Mach. Co., Inc. v. Hesston Corp.,* 878 F.2d 1290, 1295 n. 5

(10th Cir.1989) ("A 'horizontal restraint' . . . represents 'an agreement among competitors on the way in which they will compete with one another' and is often held to be unreasonable as a matter of law.") (quoting *NCAA,* 468 U.S. at 99, 104 S.Ct. 2948).

**14.**  *See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 501, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988); *National Soc'y of Prof'l Eng'rs,* 435 U.S. at 687–90, 98 S.Ct. 1355; *Wilk v. American Med. Ass'n,* 719 F.2d 207, 221 (7th Cir.1983); *Kreuzer v. American Academy of Periodontology,* 735

may still constitute a *per se* violation in egregious cases, where the standard adopted has no other purpose than to facilitate collusion or to exclude a superior product. *See* 13 Hovenkamp, Antitrust Law ¶ 2232b, at 354 (1999).[15] Whether this case is that egregious case cannot be confidently determined at this early stage of the litigation. *See General Leaseways, Inc. v. National Truck Leasing Ass'n,* 744 F.2d 588, 595 (7th Cir.1984) ("[The] *per se* rule would collapse if every claim of economies from restricting competition, however implausible, could be used to move a horizontal agreement not to compete from the *per se* rule to the Rule of Reason.").

## 2. Relevant Market

As discussed above, the dispositive inquiry under the Rule of Reason focuses on the impact of a restraint on competition. *See, e.g., NCAA,* 468 U.S. at 104, 104 S.Ct. 2948; *National Soc'y of Prof'l Eng'rs,* 435 U.S. at 692, 98 S.Ct. 1355. In this regard, an antitrust plaintiff must ultimately show: "(1) that the conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market; (2) that the objects and conduct pursuant to the conspiracy were illegal; and (3) that the plaintiff was injured as a proximate result of the conspiracy." *Advanced Health–Care Servs.,* 910 F.2d at 144. In this case, defendants seek threshold dismissal by arguing that plaintiffs have failed adequately to plead the existence of (i) a relevant market in which competition has been adversely affected by the adoption of the carry-on baggage restrictions, and (ii) that plaintiffs have suffered antitrust injury in that market. Defendants' arguments in this regard miss their mark.

■ In demonstrating that allegedly anticompetitive conduct imposes an unreasonable restraint of trade, a plaintiff "must prove what market . . . was restrained and that the defendants played a significant role in the relevant market." *Oksanen v. Page Mem. Hosp.,* 945 F.2d 696, 709 (4th Cir.1991). It follows that relevant market definition is central to the analysis, and this definition has two components: "(1) the relevant product market, which identifies the products or services that compete with each other, and (2) the relevant geographic market which identifies the geographic area within which competition takes place." *America Online,* 49 F.Supp.2d at 857; *see Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Specifically, the relevant product market is defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co.,* 370 U.S. at 325, 82 S.Ct. 1502.[16] The relevant geographic market, on the other hand, is "the area of effective competition"—that is, the regions in which

---

F.2d 1479, 1493–94 (D.C.Cir.1984); *Brenner,* 675 F.2d at 454–55.

**15.** This is so because "members of such [standard-setting] associations often have economic incentives to restrain competition and . . . the product standards set by such associations have a serious potential for anticompetitive harm," and the actions of those members may potentially be so egregious as to justify *per se* treatment. *Allied Tube,* 486 U.S. at 500, 108 S.Ct. 1931. In addition, "[p]roduct standardization might impair competition in several ways. . . . [It] might deprive some consumers of a desired product, eliminate quality competition, exclude rival producers, or facilitate oligopolistic pricing by easing rivals' ability to monitor each other's prices." *Id.* at 500 n. 5, 108 S.Ct. 1931 (quoting 7 P. Areeda, Antitrust

Law ¶ 1503, at 373 (1986) (omission and second alteration in original)).

**16.** *See also United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (The relevant market, for antitrust purposes, "is composed of products [or services] that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered."); *American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.,* 185 F.3d 606, 622–23 (6th Cir.1999) (noting that "[t]he relevant market includes those products or services that are reasonably interchangeable with, as well as identical to, defendant's product").

consumers may reasonably be expected to turn to sources of supply if the price of the product in the product market increases. *Standard Oil Co.*, 337 U.S. at 299 n. 5, 69 S.Ct. 1051.

The complaint alleges that "the relevant antitrust market is the market for departing commercial airline passengers from Dulles." (¶ 36.) Defendants argue that this is not a relevant market because flights leaving from Dulles do not represent a set of goods or services that are reasonably interchangeable to consumers—that is, flights originating from Dulles, but headed to different destinations, are not interchangeable with each other.[17] Accordingly, say defendants, plaintiffs could not have lost customers unless one or more of the other carriers at Dulles flies to the same destinations to which plaintiffs fly—a fact not alleged in plaintiffs' complaint. Defendants further claim that the relevant market is "city pairs"—that is, all the flights from the Washington D.C. metropolitan area to a particular location. In this regard, plaintiffs could not have suffered injury, as travelers could choose to depart from Ronald Reagan Washington National Airport ("Reagan National"), which also serves the Washington, D.C., area, and thereby avoid defendants' carry-on baggage restrictions altogether.

The short and conclusive response to defendants' arguments is that, again, it is too early in the proceedings to decide whether the relevant market pled by plaintiffs is insufficient. First, definition of a relevant market may be unnecessary under the Rule of Reason where the anticompetitive effects of an allegedly illegal agreement are manifest and any justifications for the agreement are implausible.[18] Put differently, "if the restraint has obvious anticompetitive effects, the court may proceed directly to weighing the procompetitive and anticompetitive effects, 'even in the absence of a detailed market analysis,' and ultimately condemn a restraint that has a net anticompetitive effect." *Virginia Vermiculite Ltd. v. W.R. Grace & Co.*, 108 F.Supp.2d 549, 571 (W.D.Va.2000) (quoting *NCAA*, 468 U.S. at 110, 104 S.Ct. 2948). Here, the complaint alleges that defendants' agreement to restrict carry-on baggage size has caused patently anticompetitive effects and is unsupported by any reasonable justifications, such that a detailed marked analysis plausibly may be unnecessary to the disposition of this case.[19] Thus, because plaintiffs, on the face of the complaint, have alleged a naked agreement by defendants to restrain competition, and because a "naked restraint on price and output requires some competitive justification even

17. For example, defendants argue that a traveler needing to fly from Washington, D.C., to New York City would not consider a flight to Beijing, China, to be interchangeable.

18. *See, e.g., Indiana Fed'n of Dentists*, 476 U.S. at 458–61, 106 S.Ct. 2009 (holding that "the finding of actual, sustained adverse effects on competition ..., viewed in light of the reality [of the] markets [involved] ..., [was] legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis"); *NCAA*, 468 U.S. at 110, 104 S.Ct. 2948 ("As a matter of law, the absence of proof of market power does not justify a naked restriction on price or output. To the contrary, when there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such

an agreement.' ") (quoting *National Soc'y of Prof'l Eng'rs*, 435 U.S. at 692, 98 S.Ct. 1355).

19. Defendants argue that proof of actual detrimental effects on competition only serves as a proxy for market power, and that such proof does not dispense with plaintiffs' duty to define the relevant market. This attempt to distinguish market power from market definition is unpersuasive, as "market definition merely provides an analytical framework for assessing market power, which in turn is fundamental to the determination of whether the conduct in question can harm competition and consumers." James A. Keyte, *Market Definition and Differentiated Products: The Need for A Workable Standard*, 63 Antitrust L.J. 697, 697 (1995). Thus, a showing of manifest anticompetitive effects *a fortiori* renders unnecessary the definition of a relevant market.

in the absence of a detailed market analysis," defendants' dismissal motion for failure to plead a relevant antitrust market must be denied. *NCAA*, 468 U.S. at 110, 104 S.Ct. 2948.

■ Second, the definition of a relevant antitrust market is a highly fact-intensive inquiry; accordingly, a motion to dismiss a complaint for failure adequately to plead a relevant antitrust market should be granted only where the alleged market can be deemed "patently implausible solely on the basis of the four corners of the [complaint]." *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F.Supp. 639, 646–47 (S.D.N.Y.1992). Here, the market alleged in plaintiffs' complaint—namely, flights departing from Dulles—is not a facially implausible antitrust market, as an inquiry into cross-elasticities of demand and the area of effective competition plausibly could reveal plaintiffs' alleged market to be relevant. For example, it is plausible that, as plaintiffs contend, Dulles and Reagan National are in different geographical markets, that consumers prefer one airport over the other, and that there are other relevant differences in the services offered by the airports that separate them as geographic markets.[20] In addition, it remains to be seen whether plaintiffs, in fact, compete with defendants in city pairs with Dulles as the point of origin. These are considerations essential to the definition of the relevant market that must await development of a factual record.[21]

Thus, because "it is not inconceivable" that plaintiffs "could prove a set of facts supporting the relevant market definition alleged in its complaint," defendants' dismissal motion must fail.[22] *MCM Partners v. Andrews–Bartlett & Assocs.*, 62 F.3d 967, 977 (7th Cir.1995); *see also Conley*, 355 U.S. at 45–46, 78 S.Ct. 99. Indeed, that defendants contest plaintiffs' alleged antitrust market with references to facts outside the complaint—facts that, at the threshold dismissal stage cannot be assumed—casts in bold relief the prematurity of resolving this issue now. "While arguments concerning substitutability or 'cross-elasticity of supply' may be appropriate on a motion for summary judgment, they [are] inappropriate in the context of a motion to dismiss." *Michael Anthony Jewelers*, 795 F.Supp. at 646–47; *cf. Advanced Health–Care Servs.*, 910 F.2d at 145 ("Until some discovery is completed, there is no record upon which to assess the

**20.** The definition of the appropriate market is particularly complicated given the number of factors that may be part of the complex calculus performed by airline customers in choosing an airport and airline when traveling to and from the Washington, D.C., metropolitan area. *Cf.* 7 Phillip Areeda, Antitrust Law ¶ 553, at 238 (consumer preferences may narrow the relevant geographic market). For example, few, if any, commercial flights in excess of 1,250 miles take off from Reagan National, while the range of flights departing from Dulles is not so limited. *See* 49 U.S.C. §§ 49109, 41718; 14 C.F.R. § 93.253 (2000). This complexity especially underscores the inappropriateness of threshold disposition of the question of the relevant market.

**21.** *See, e.g., Brown Shoe Co.*, 370 U.S. at 336–37, 82 S.Ct. 1502 ("Congress prescribed a pragmatic, factual approach to the definition of the relevant market.... The geographic market selected must ... correspond to the commercial realities of the industry and be economically significant.")

**22.** Defendants' reliance on *America Online*, 49 F.Supp.2d at 857–59, is also misplaced. That case involved a Section 2 monopolization claim in which proper market definition was critical to the plaintiff's pleading burden. *See, e.g.*, Antitrust Law Developments 495 (4th ed. 1997) ("Under Section 2 of the Sherman Act, identification of the relevant market is the equivalent of a jurisdictional element essential to proving monopolization or attempt to monopolize.") (footnote omitted). Here, however, market analysis may be unnecessary if, as plaintiffs allege, defendants' agreement has obvious anticompetitive effects and has no countervailing procompetitive justifications. *See, e.g., Indiana Fed'n of Dentists*, 476 U.S. at 458–61, 106 S.Ct. 2009; *Virginia Vermiculite*, 108 F.Supp.2d at 571. *America Online* is further distinguishable, as the alleged relevant market there, unlike the market alleged in this case, was patently implausible. *See America Online*, 49 F.Supp.2d at 858–59.

reasonableness of the restraints alleged by the plaintiff, so summary dismissal of the plaintiff's § 1 Sherman Act claims ... was inappropriate."). Whether plaintiffs will ultimately prevail on this issue is, of course, a different question. But, for present purposes, the issue "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683.[23] Here, plaintiffs are so entitled, and defendants' motion in this regard must fail.

### 3. Antitrust Injury

■ Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold damages by him sustained." 15 U.S.C. § 15(a). The injury suffered, however, may not simply be "causally linked to an illegal presence in the market"; rather, "[p]laintiffs must prove *antitrust injury*, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[24] Thus, "[b]ecause the antitrust laws are intended to protect competition, and not simply competitors, only injury caused by damage to the competitive process may form the basis of an antitrust claim." *Thompson Everett, Inc. v. National Cable Adver.*, 57 F.3d 1317, 1325 (4th Cir.1995).

■ Viewed through the lens of these principles, the complaint's allegations pass Section 4 muster. This is so because the complaint alleges that defendants' agreement restrained competition among airlines at Dulles and that, as a result, plaintiffs lost customers, i.e., market share, they would otherwise have won by virtue of their investment in, and adoption of, a passenger-friendly carry-on baggage policy. This is classic antitrust injury. Thus, these allegations, "although skeletal, could fulfill all of the elements of [plaintiffs'] claims" and are therefore sufficient to sustain plaintiffs' pleading burden. *Advanced Health–Care Servs.*, 910 F.2d at 149; *see, e.g., Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 n. 14, 97 S.Ct. 690, 50 L.Ed.2d 701 ("[T]he case for relief will be strongest where competition has been diminished.").[25]

■ To be sure, plaintiffs also allege that defendants' restrictive agreement has harmed consumers by (i) reducing pressure on other airlines to accommodate customer preferences; (ii) causing, among other things, confusion, frustration, and delay at security checkpoints and ticket counters at Dulles; and (iii) delaying customers at destination airports by making them wait to retrieve baggage that they otherwise would have carried-on or gate-checked. And, it is also true, as defendants argue, that these allegations, standing alone, fall short of alleging a qualifying antitrust injury, for allegations of harm to consumers are generally insufficient to show injury to an antitrust claimant's "business or property." 15 U.S.C. § 15(a) (emphasis added). But, of course, these allegations of harm to consumers do not stand alone in the complaint; rather, plaintiffs' allegations regarding the effects of defendants' allegedly anticompetitive con-

**23.** Also worth noting is the possibility that discovery may yield information causing plaintiffs to advocate a relevant market different or more detailed in some respects than the market alleged in the complaint.

**24.** *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (emphasis added); *accord Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Thompson Everett, Inc. v.*

*National Cable Adver.*, 57 F.3d 1317, 1325 (4th Cir.1995).

**25.** This conclusion is also appropriate given that "an analysis of antitrust injury ... [is] more properly conducted after discovery." *CSR*, 40 F.Supp.2d at 566; *see, e.g., Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 875 (1995) ("[T]he existence of an 'antitrust injury' not typically resolved through motions to dismiss.").

duct on consumers merely provide the context in which plaintiffs' claims for lost profits and other damages are made. These factual allegations merely represent a manifestation of the anticompetitive effects of defendants' conduct, from which flow plaintiffs' alleged injuries, i.e., lost profits. *See Brown Shoe Co.*, 370 U.S. at 320, 82 S.Ct. 1502.[26] Accordingly, defendants' motion to dismiss on this basis must be denied.[27]

### B. Preemption

Prior to 1978, the federal government regulated interstate airline travel and the states often regulated intrastate air travel. *See Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1262 (9th Cir.1998) (en banc). In 1978, Congress concluded that competitive market forces, rather than federal regulation, would lead to greater efficiency, lower prices, greater variety, and better quality in the air carrier industry. *See id.* To this end, it passed the Airline Deregulation Act. *See* 49 U.S.C. § 41713(b). And, to prevent the states from "undo[ing] federal deregula-

tion with regulation of their own," [28] Congress enacted an express preemption provision, which provides, in pertinent part, that "a State ... may not enact or enforce a law, regulation or other provision having the force and effect of law related to a price, route or service of an air carrier." 49 U.S.C. § 41713(b)(1). The Supreme Court has broadly interpreted this language to mean that the ADA preempts any "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services.' " *Morales v. Trans World Airlines*, 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (quoting 49 U.S.C.App. § 1305(a)(1)). Yet, it is also true that the ADA's preemptive reach does not extend to state actions that affect airline rates, routes, or services "in too tenuous, remote, or peripheral a manner." *Id.* at 390, 112 S.Ct. 2031; *see Smith v. Comair, Inc.*, 134 F.3d 254, 257 (4th Cir. 1998). Thus, preemption of a state law claim by the ADA requires the claim (i) to rely upon the enforcement of state law and (ii) to relate to an airline's rate, route, or service in more than an overly tenuous,

26. For similar reasons, defendants' argument that plaintiffs do not have "antitrust standing"—that is, that even if plaintiffs suffered "antitrust injury," other prudential considerations make them improper plaintiffs under Section 4 of the Clayton Act—is unpersuasive. Defendants are correct that "[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 219 (4th Cir.1987); *see also Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Blue Shield of Va. v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). Here, however, while the complaint includes allegations concerning detrimental effects on consumers, on which defendants myopically focus, it also includes the requisite allegations of antitrust injury to plaintiffs' business and property. As such, defendants' standing argument is unpersuasive.

27. It is worth noting that defendants have not challenged plaintiffs' standing to seek injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. This is not surprising as the complaint's allegations clearly "demonstrate a significant threat of injury from an impending violation ... or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

Finally, the Fourth Circuit has held that claims under Virginia's antitrust law, Va.Code § 59.1–9.5, will generally stand or fall with the analogous claim under federal law. *See, e.g., Satellite Television & Assoc. Resources, Inc. v. Continental Cablevision of Va., Inc.*, 714 F.2d 351, 358 & n. 13 (4th Cir.1983). Accordingly, defendants' motion to dismiss Count II of plaintiffs' complaint for failure to state a claim under the Virginia Antitrust Act must also fail.

28. *Morales*, 504 U.S. at 378, 112 S.Ct. 2031.

remote, or peripheral a manner.[29]

The first of the prerequisites for preemption is met here, for it is clear that plaintiffs' state law claims rely on the enforcement of state law. Plaintiffs' state-law claims do not merely "seek recovery solely for the airline's breach of its own, self-imposed undertakings" such that they "do not amount to a State's 'enact[ment] or enforce[ment] of any law, rule, regulation, standard, or other provision having the force and effect of law.'" *American Airlines, Inc. v. Wolens*, 513 U.S. 219 228–29, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). To the contrary, the complaint's state-law counts all allege that defendants' agreement to restrict carry-on baggage size violates either Virginia statutory or common law in the way the agreement affects plaintiffs' business and their relationship with their customers.[30] Thus, these are claims that "cannot be adjudicated without resort to outside sources of law" and are, therefore, subject to preemption by the ADA to the extent that they have a connection with, or refers to, airline rates, routes, or services. *Smith*, 134 F.3d at 257; *see Wolens*, 513 U.S. at 233, 115 S.Ct. 817.

The second prerequisite for the operation of ADA preemption—namely, that the state-law claim relate to an airline's rate, route, or service in more than an overly tenuous, remote, or peripheral a manner— is also met in this case. In determining whether a claim satisfies this requirement, a court, keeping in mind that the ADA "express[es] a broad pre-emptive purpose" in reaching claims "relating to" rates, routes, or services, must look at the facts underlying the specific claim. *Morales*, 504 U.S. at 383, 112 S.Ct. 2031 ("The ordinary meaning of these words is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'") (quoting Black's Law Dictionary 1158 (5th ed.1979)); *see Smith*, 134 F.3d at 259. In this case, plaintiffs' claims, which challenge defendants' agreement to restrict the size of carry-on baggage at Dulles, clearly relate to "services of an air carrier" that a state law may not regulate under the ADA. 49 U.S.C. § 41713. An airline's carry-on baggage policy quite plainly falls squarely within the range of services airlines provide their passengers. As the Fifth Circuit has held,

> [e]lements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself. These matters are all appurtenant and necessarily included with the contract of carriage between the passenger or shipper and the airline.

*Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir.1995) (en banc) (quotation omitted). Indeed, in this case, the complaint itself alleges that a primary function of the airlines involved in this case is the "transport[ of] passengers, baggage and cargo both domestically and internation-

---

**29.** *See, e.g., Smith*, 134 F.3d at 257; *see also Travel All Over World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1431–32 (7th Cir.1996); *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 229–30, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995).

**30.** It is irrelevant for ADA preemption purposes whether a claim implicates a state's statutory or common law. *See Travel All Over World*, 73 F.3d at 1435. Thus, that plaintiffs' claims for tortious interference with contractual relations and with prospective economic advantage are common-law tort claims does not insulate these claims from preemption, for they nevertheless involve the "enactment or enforcement" of state laws. *Id.; cf. Smith*, 134 F.3d at 259 (holding that false imprisonment and intentional infliction of emotional distress claims are preempted to the extent that they relate to an airline's boarding practices).

Moreover, simply because Virginia's antitrust and conspiracy statutes are statutes of general application does not preclude ADA preemption, for the Supreme Court has rejected the notion that "only state laws specifically addressed to the airline industry are preempted, whereas the ADA imposes no constraints on laws of general applicability." *Morales*, 504 U.S. at 386, 112 S.Ct. 2031.

ly." (¶¶ 8–9 (emphasis added).) In addition, plaintiffs themselves allege that their carry-on baggage policies are outlined in their contracts of carriage with customers and have argued that defendants' agreement to restrict carry-on baggage size interferes with an "increasingly important element of the product being provided to the flying public—the size of carry-on or gate-checked baggage." [31] Thus, an examination of plaintiffs' own allegations and arguments compels the conclusion that carriage of baggage is a "service" provided by airlines within the plain and ordinary understanding of the term.

The same conclusion finds firm support in *Smith*. There, a passenger sued an airline for breach of contract, false imprisonment, and intentional infliction of emotional distress because he was not allowed to board his connecting flight without showing picture identification, despite having been permitted to board his initial flight without such identification. *See Smith*, 134 F.3d at 256. The Fourth Circuit panel concluded that boarding procedures were undoubtedly a service rendered by an airline within the meaning of the ADA's preemption provisions. *See id.* at 259. The panel took particular note of the fact that federal law governed the discretion of airlines in making boarding decisions related to safety and concluded that "[i]f passengers could challenge airlines' boarding procedures under general contract claims ..., we would allow the fifty states to regulate an area of unique federal concern—airlines' boarding practices." *Id.* at 258–59. Thus, held the panel, to the extent the plaintiff's claims were based on the airline's boarding procedures, they were preempted. *See id.* at 259. Similarly, because plaintiffs' claims in this case also involve boarding procedures governed by federal law, they involve a "service" provided by airlines within the meaning of the ADA. Specifically, plaintiffs'

claims arise from the performance of a necessary service by the airlines operating at Dulles—namely, security screening of carry-on luggage. Such screening is required by FAA regulations,[32] and contributes to the safety of airline passengers by preventing weapons and other dangerous materials from being transported onto airplanes. This service is therefore analogous to the boarding procedures found to be a service in *Smith*, as it is covered by federal regulation and mandated by safety considerations. *See id.*

Nor is there any doubt that plaintiffs' state-law claims "relate to" such services. The factual basis for plaintiffs' state-law claims—indeed, for all of their claims—involves the manner in which airlines at Dulles provide carry-on baggage carriage service. Specifically, the gravamen of plaintiffs' complaint, as it pertains to the state-law claims, is that both Virginia common and statutory law prohibit the manner in which defendants have effectively dictated the carry-on baggage policies of airlines at Dulles. The necessary implication of this charge is that Virginia law in a meaningful way dictates the way air carriers must tailor their baggage carriage policies. Thus, the necessary nexus between plaintiffs' state-law claims and the services provided by air carriers is evident, and the state laws invoked by plaintiffs plainly affect airline services in ways that are not "tenuous, remote, or peripheral." *Id.* at 257 (quoting *Morales*, 504 U.S. at 390, 112 S.Ct. 2031).

Plaintiffs argue that because the ADA was designed "to promote 'maximum reliance on competitive market forces,'" it cannot be read to preempt their state-law claims, which, in effect, are aimed at fulfilling those goals. *Wolens*, 513 U.S. at 230, 115 S.Ct. 817 (quoting *Morales*, 504 U.S. at 378, 112 S.Ct. 2031). Yet, plaintiffs misapprehend the function of the ADA's express

---

**31.** Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss the Complaint and to Stay Discovery, at 6.

**32.** *See* 51 Fed.Reg. 19,134, 19,136; 52 Fed. Reg. 21,472, 21,473.

preemption provision, for that provision represents Congress's decision to promote competition by affirmatively foreclosing state participation in the regulation of the price, route, or service, of an air carrier whether or not that participation purports to be consistent with the ADA. Thus, state fair competition laws, such as those at issue here, serve to regulate competition and are precisely what the ADA's preemption clause was designed to prevent. *See Taj Mahal Travel,* 164 F.3d at 194 ("[T]he preemption clause was intended to prevent the states from re-regulating airline operations....").  In this regard, the instant case is clearly analogous to *Morales,* in which the Supreme Court concluded that the ADA's preemption clause prevented states from barring allegedly deceptive airline fare advertisements though enforcement of their general consumer protection statutes. *See Morales,* 504 U.S. at 389–90, 112 S.Ct. 2031.  State fair competition and economic tort laws, like the consumer protection laws at issue in *Morales,* are undoubtedly designed to promote competition, as plaintiffs argue.  Yet, they do so by regulating competition, and the use of state regulation is dispositive in the preemption analysis under the ADA. *See id.* ("All in all, the obligations imposed by the [state consumer protection laws] would have a significant impact upon the airlines' ability to market their product....").  In other words, as many decisions reflect, even though plaintiffs' state-law claims seek to promote fair competition, they are still preempted by the ADA because they

conflict with the ADA's purpose of preventing state regulation—of any kind—of the rates, routes, and services provided by air carriers.[33]  Thus, plaintiffs' argument is unpersuasive, and their state-law claims must be dismissed as preempted by the ADA. *Cf. Federal Express Corp. v. United States Postal Serv.,* 55 F.Supp.2d 813 (W.D.Tenn.1999) (dismissing tortious interference with business relations claim).

### C. Primary Jurisdiction

■ Finally, defendants invoke the doctrine of "primary jurisdiction" in support of a dismissal or stay and referral of the matter to the FAA. Primary jurisdiction mandates the suspension of judicial proceedings over a claim that "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body" while "referral of such issues to the administrative body for its views" is pending. *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *see Advamtel, LLC v. Sprint Communications Co.,* 105 F.Supp.2d 476, 480 (E.D.Va.2000).  The doctrine serves to promote "uniform outcomes"[34] and to "coordinate administrative and judicial decision-making by taking advantage of agency expertise and referring issues of fact not within the conventional expertise of judges or cases which require the exercise of administrative discretion."[35]  Put differently, the doctrine pro-

---

33.  *See, e.g., Wine & Spirits Wholesalers of Mass., Inc. v. Net Contents, Inc.,* 10 F.Supp.2d 84, 87 (D.Mass.1998) (dismissing tortious interference with business relations claim as preempted by the ADA); *Virgin Atlantic Airways, Ltd. v. British Airways, PLC,* 872 F.Supp. 52, 66–67 (S.D.N.Y.1994) (dismissing as preempted plaintiff's common law claims of unfair competition, tortious interference with contract and tortious interference with prospective business relations); *Continental Airlines, Inc. v. American Airlines, Inc.,* 824 F.Supp. 689, 693–95, 713 (S.D.Tex.1993) (dismissing as preempted plaintiffs' state-law claims for unfair competition and tortious interference with business relations and not-

ing that "if state-law claims such as those advanced by [plaintiffs] were not preempted, airlines would have to be wary lest their activities relating to setting rates, determining routes, and providing services run afoul of any number of state laws, even though their activities fully complied with both the ADA and federal antitrust laws").

34.  *Allnet Communication Serv., Inc. v. National Exch. Carrier Ass'n, Inc.,* 965 F.2d 1118, 1120 (D.C.Cir.1992)

35.  *Environmental Tech. Council v. Sierra Club,* 98 F.3d 774, 789 (4th Cir.1996).

motes "proper relationships between the courts and administrative agencies charged with particular regulatory duties" by allocating decision-making to the body appropriately charged with the interpretation or administration of the laws. *Western Pac. R.R. Co.*, 352 U.S. at 63, 77 S.Ct. 161. In addition, primary jurisdiction "serves judicial economy because the dispute may be decided by the administrative agency and obviate the need for court intervention." *Advamtel*, 105 F.Supp.2d at 480.

■ Given the doctrine's goal of respecting the proper spheres of the courts and administrative agencies, it follows that invocation of the doctrine is appropriate only where "a factual question requires both expert consideration" by an administrative body and "uniformity of resolution." *United States v. McDonnel Douglas Corp.*, 751 F.2d 220, 224 (8th Cir.1984). This is so because "[t]he doctrine functions not to determine whether the court or agency will finally decide the issue; rather it serves to delay the judicial decision until the court can take advantage of the agency's expertise." *Pinehurst Airlines, Inc. v. Resort Air Servs., Inc.*, 476 F.Supp. 543, 549 (M.D.N.C.1979). Application of the doctrine, therefore, is inappropriate where consideration of a claim by an administrative body would not aid in the judicial decisional process. *See Environmental Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir.1996) (affirming trial court determination that primary jurisdiction applied only to the referral of factual, not legal, issues).

■ The Supreme Court has admonished that "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," and that "[i]n every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Western Pac. R.R. Co.*, 352 U.S. at 64, 77 S.Ct. 161. As an aid to determining whether the doctrine should apply in any given case, courts—including this one—have identified four factors to consider:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
>
> (2) whether the question at issue is particularly within the agency's discretion;
>
> (3) whether there exists a substantial danger of inconsistent rulings; and
>
> (4) whether a prior application to the agency has been made.

*AT & T Communications of Va. Inc. v. Bell Atlantic—Va., Inc.*, 35 F.Supp.2d 493, 498 (E.D.Va.1999) (quoting *National Communications Ass'n v. American Tel. & Tel. Co.*, 46 F.3d 220, 223 (2d Cir.1995)); *see Advamtel*, 105 F.Supp.2d at 480.

■ A consideration of these factors, in light of the principles elucidated above, compels the conclusion that invocation of the doctrine of primary jurisdiction would be inappropriate in this case. First, this lawsuit does not "raise issues of fact not within the conventional experience of judges," as defendants' liability under the Sherman Act depends on an evaluation of the anticompetitive effects of defendants' agreement to restrict carry-on luggage size at Dulles and of defendants' proffered justifications—quintessentially judicial tasks. *Pinehurst Airlines*, 476 F.Supp. at 549. Second, plaintiffs do not contend that defendants' carry-on baggage agreement is contrary to FAA regulations, nor does disposition of plaintiffs' antitrust claim require a finding of a violation of such regulations.[36] In this regard, and because "antitrust ... is a field in which the FAA has

---

**36.** Indeed, to the contrary, it appears that the FAA has already ruled that airlines may adopt a flexible carry-on baggage policy. *See* Fed. Reg. 19,134 (May 27, 1986); 52 Fed.Reg. 21, 472 (June 5, 1987) (rejecting flight attendants' petition for a regulation limiting the size of all carry-on baggage to 9 in. by 16 in. by 20 in).

no special expertise," the expertise of the FAA would not aid in the disposition of plaintiffs' federal antitrust claim. *Id.* at 549. Third, neither party has made a prior application to the FAA for analysis or comment regarding the baggage templates. Thus, resolution of this matter would not frustrate legitimate agency proceedings. Finally, judicial disposition of plaintiffs' antitrust claim does not raise any substantial danger of inconsistent rulings. Accordingly, defendants' motion to dismiss under the doctrine of primary jurisdiction must fail.

An appropriate order has been issued.